IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

JORDAN C., JESSE C., KAILYNN C., )
and MICHELE C., )
                                    )
                   Appellants, )        2 CA-JV 2009-0019
                                    )   2 CA-JV 2009-0020
            v.                      )   (Consolidated)
                                    )   DEPARTMENT B
ARIZONA DEPARTMENT OF          )
ECONOMIC SECURITY,             )        O P I N I O N
KERRY C., and KIMBERLY C.,     )
                                    )
                   Appellees, )
                                    )
            and                     )
                                    )
MAUREEN O.,                         )
                                    )
                   Intervenor. )
                                    )

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. 16849100

Honorable Virginia C. Kelly, Judge

REVERSED

Child Advocacy Clinic
 By Paul D. Bennett, a clinical professor appearing
    under Rule 38(d), Ariz. R. Sup. Ct., and
    Alexandra Lukic and Gemma Zanowski,
    students certified pursuant to Rule 38(d),
    Ariz. R. Sup. Ct.                                    Tucson
                                      Attorneys for Appellants
                           Jordan C., Jesse C., and Kailynn C.

Nuccio & Shirly, P.C.
  By Jeanne Shirly

                                                                    Tucson
                                        Attorneys for Appellant Michele C.

Terry Goddard, Arizona Attorney General
  By Pennie J. Wamboldt
  and Dawn R. Williams                                            Prescott
                                                                    Tucson
                                       Attorneys for Appellee Arizona
                                      Department of Economic Security

Frederick S. Klein
                                                                    Tucson
                                            Attorney for Appellees
                                          Kerry C. and Kimberly C.

Margo Amrit Donaldson
                                                                    Tucson
                                            Attorney for Intervenor

VÁSQUEZ, Judge.

¶1 Michele C. and three of her children, Jesse, Jordan, and Kailynn (the Older Children), appeal the juvenile court's order terminating Michele's parental rights to her two youngest children, six-year-old Kerry and four-year-old Kimberly. The court terminated Michele's parental rights on the ground she had been unable to remedy the circumstances that caused Kerry and Kimberly to remain in an out-of-home placement for fifteen months or longer and there was a substantial likelihood she would be unable to parent them in the near future. *See* A.R.S. § 8-533(B)(8)(c).[1] The court also found termination to be in the girls' best interests.

---

[1] Section 8-533(B)(8) was amended in 2008, and former § 8-533(B)(8)(b) has been renumbered as § 8-533(B)(8)(c). 2008 Ariz. Sess. Laws, ch. 198, § 2. We refer in this decision to the provision currently in force.

¶2 Michele and the Older Children argue the Arizona Department of Economic Security (ADES) failed to meet its burden of establishing with clear and convincing evidence that (1) Michele was unable to parent effectively at the time of the hearing, (2) there was a substantial likelihood she would be incapable of exercising proper and effective parental care in the near future, and (3) ADES had made a diligent effort to provide appropriate services to reunify Kerry and Kimberly with Michele.[2] The Older Children also argue the juvenile court erred in finding termination was in the best interests of Kerry and Kimberly. Because we agree the evidence was insufficient to support any alleged statutory ground for terminating Michele's parental rights to Kerry and Kimberly, we reverse the court's order.

## I. Facts and Procedural Background

¶3 In March 2007, ADES filed a petition alleging that then nine-year-old Jordan, eight-year-old Jesse, six-year-old Kailynn, three-year-old Kerry C., and two-year-old Kimberly C. were dependent children. The children previously had been the subjects of a dependency proceeding initiated in March 2004, due, in part, to their parents' methamphetamine use. That dependency had been dismissed in March 2006 after the parents successfully completed their case plans.

¶4 In May 2007, Michele admitted the allegations in an amended dependency petition, including allegations she had tested positive for methamphetamine use on March 26,

----

[2]ADES has challenged the standing of the Older Children to appeal the juvenile court's ruling. We agree with them, however, that ADES waived this argument by failing to object to their participation at the termination hearing. *See Torrez v. State Farm Mut.*, 130 Ariz. 223, 225 n.2, 635 P.2d 511, 513 n.2 (App. 1981).

but not since; the children's father, Jesse C., Sr. had relapsed into methamphetamine abuse; the couple had recently engaged in domestic violence; and Michele had no stable housing or employment and could not care for the children and, as a result, had left Kerry, who is developmentally delayed, with the children's paternal great-grandmother. The juvenile court adjudicated the children dependent and approved a case plan goal of reunification.[3]

¶5 In July, in compliance with her case plan tasks, Michele participated in a psychological evaluation conducted by Dr. Lorraine Rollins. In her evaluation report, Rollins opined that Michele could not "adequately care for her children at this time due to her high level of defensiveness" and needed "to make genuine change through therapeutic intervention." Rollins emphasized the need for "direct assessment of the parent-child relationships to gauge them and [Michele's] parenting skills." She wrote, "It is quite conceivable that [Michele] may not be able to parent all of her children (and perhaps none of her children) adequately. Her progress and response to [recommended] interventions . . . and any intervention recommended by the direct assessment of her parenting relationships with her children will likely determine" her ability to parent one or more of them. As intervention services in addition to the "direct assessment of the mother-child relationship[]" between Michele and each of her children, Rollins recommended Michele be offered and participate in ongoing random drug and alcohol screening, substance abuse treatment and an

---

[3] Jesse C., Sr. was incarcerated at the time of the termination hearing. He relinquished his parental rights to Kerry and Kimberly on November 19, 2008, and the juvenile court terminated his parental rights on December 19, 2008. He is not a party to this appeal.

4

aftercare support group, parenting instruction, individual therapy, and domestic violence group therapy.

¶6 In August 2007, Child Protective Services (CPS) case manager Michael Joosten, who had also been assigned as the family's case manager during the previous dependency proceeding, reported his concerns that Michele "[might] not be able to solely care for all five children," particularly in light of "the issues that Kerry, Jord[a]n and Jesse Jr. continue to have."[4] But, he wrote, "On the positive side . . . , there are relative placements that are willing and able to care for the children and still keep a relationship with both parents."[5] After reviewing Joosten's report following a September dependency review hearing, the court again approved the case plan goal of reunification and directed that ADES "will have discretion with respect to all aspects of visitation."

¶7 In November, Joosten reported he had made a referral for a Family Group Decision Making (FGDM) meeting and again expressed "concerns about [Michele]'s ability to care for all the children at this time." He informed the juvenile court that, although relatives were "willing to become permanent placement[s] . . . [,] there is also a lot of mistrust between the parents and relatives as well as among some of the relatives," and

---

[4]In addition to Kerry's developmental delays, Jordan had been "diagnosed with [attention deficit hyperactivity disorder], anger issues, insecure attachment and depressive/manic tendencies," and Jesse had been found to have anger management issues.

[5]As of August 2007, Jordan was placed with his maternal grandparents; Jesse, Kailynn, and Kerry were placed with their paternal great-grandmother; and Kimberly was placed with Michele's cousin and his wife. In September, Jordan and Jesse were moved to therapeutic foster care. Kailynn joined Jesse in his therapeutic foster home in February 2008. Thus, by March 2008, only Kerry and Kimberly remained with relatives.

therefore, he "would like to get a FGDM meeting together as soon as possible to work out a plan that would be best for the children." He further stated that family members and foster families had agreed "to participate in a FGDM meeting [on November 2], where a permanent agreement for the children can be made by the family."

¶8        At the December 2007 dependency review hearing, the juvenile court found Michele in compliance with her case plan. Joosten reported Michele was employed, had completed a twelve-hour substance abuse pre-treatment program, and was attending parenting classes and substance abuse prevention groups. ADES told the court a FGDM session had been scheduled to address permanency for the children, and the court granted ADES discretion to place the children in accordance with that process. The court again approved a case plan goal of family reunification.

¶9        The FGDM meeting was held on January 5, 2008. A plan was made to reunify the family by transitioning the children, one by one, from their current placements into Michele's care, beginning with Jordan and proceeding in order to Kailynn, Jesse, Kimberly, and Kerry. The transitions were to begin with longer visits and overnight stays, with the time frame "to be determined by the children's needs and accl[i]mation to the change."

¶10        In a report he prepared at the end of February, Joosten explained to the juvenile court, "If at any time the team felt that it was becoming to[o] much for the children or the mother to handle, the second plan would be that the children would stay in their current placements." He also reported that Alden Carroll, a counselor who had been seeing Jordan, Jesse, and Kailynn individually and in family therapy sessions with Michele for several

6

months, had also just begun seeing Michele and Jordan together on a weekly basis. As he had previously, Joosten expressed his concern that it would "be too much" for Michele to care for all five of her children, particularly when both Jordan and Kerry had been diagnosed with special needs. He wrote:

> This case manager feels that at this time, with the mother's work schedule, having two children who have special needs and her being a single mother even with the support of her family would be too much for her. She would not be able to care for all of the children, but possibly would be able to care for Jordan and maybe Kailynn or Jesse.

¶11 Jordan was returned to Michele's care on April 14, 2008, and CPS retained psychologist Diana Indigas to provide intensive in-home therapy for Jordan and Michele during this transition. In a report prepared for a permanency hearing in May, Joosten explained there had been delays in placing the other children with Michele "because of the concern that the mother will not be able to care for all five children."[6] He recommended the plan be changed to reflect family reunification for Kailynn and Jesse, with a target date of September 30, but severance and adoption by a relative for Kerry and Kimberly. The juvenile court approved the transition of Kailynn and Jesse to Michele's care, found that Kimberly and Kerry could not be returned to Michele then, and continued the permanency hearing until September 18 without changing the plan goal of reunification.

---

[6]The record is not clear as to why Jordan's return to Michele was delayed from January 5, the date of the FGDM meeting, until mid-April, or why joint counseling sessions to assist his transition did not begin until the end of February.

7

¶12 Kailynn was returned to Michele's care in June. In September, Joosten reported to the juvenile court that both Jordan and Kailynn were doing well after placement with Michele and that Jesse was scheduled to be returned on September 12. Joosten praised Michele's "hard work" with Jordan and reported that Indigas had told him Michele "does very well" with Jordan and Kailynn, parenting them in a consistent and structured manner, and that Carroll had said Michele had been "very appropriate" with the Older Children in family therapy. Although Joosten was supportive of Michele's efforts, he opined "it would be better for Kimberly and Kerry to remain in their current placements so that the mother can focus on the three older children's needs and issues." He noted that Jesse and Jordan had a history of conflicts with each other that would require Michele's attention. Kimberly and Kerry had remained in their original placements, Kimberly with Michele's cousin and his wife, and Kerry with her paternal great-grandmother, Maureen O.[7] Joosten reported that each of these foster parents wished to adopt their respective charges and were "more th[a]n willing" to promote a relationship between the children, their siblings, and Michele.

¶13 Jesse was returned to Michele in September as planned, and at the September 18 permanency hearing, the court approved ADES's recommendation that the plan goal for Kerry and Kimberly be changed to severance and adoption. At the court's direction, ADES filed a motion to terminate Michele's parental rights to her two youngest

---

[7]Maureen intervened in the termination adjudication and has filed an intervenor's brief in response to appellants' briefs and in support of the juvenile court's termination order.

children on grounds of disabling mental illness or chronic drug abuse, *see* § 8-533(B)(3), and fifteen-month, time-in-care, *see* § 8-533(B)(8)(c).

¶14　　　　After a four-day hearing, the juvenile court issued a lengthy and detailed order in which it summarized some of the family's history. The court found ADES had failed to prove Michele was an unfit parent because of chronic substance abuse or disabling mental illness, *see* § 8-533(B)(3), the alternative grounds ADES had alleged, stating:

> The evidence indicated that [Michele] had demonstrated sobriety for fourteen months and had progressed to the point where her three oldest children were returned to her. Therefore, the Department did not prove by clear and convincing evidence that the condition would continue for a prolonged indeterminate period.
>
> With respect to mental illness, there was evidence that the mother's denial and/or defensiveness may have prevented genuine progress in therapy. However, her in-home therapist indicated that the mother had made sufficient progress to safely parent the three oldest children presently in her care. Therefore, the Department did not prove by clear and convincing evidence that the condition would continue for a prolonged indeterminate period.

¶15　　　　In addressing the motion to terminate Michele's rights pursuant to § 8-533(B)(8)(c), the juvenile court wrote:

> The circumstance which caused the children to be placed out-of-home was neglect. The parents' methamphetamine use was the primary reason for the neglect. Following removal [in 2004], Kerry . . . was diagnosed as failure to thrive and placed at Casa de los Ninos where global developmental delays were noted. Kimberly was small for her age, developmentally behind in walking and talking and not expressive of her needs. . . .
>
> During the dependency, [Michele] maintained sobriety. She also addressed some of the denial/defensiveness concerns

9

identified in her psychological evaluation. However, she still does not appear to fully understand Kerry['s] developmental delays.

The Department offered many services to assist the mother, including drug testing, therapy, supervised visitation, and parenting classes. Despite these services, [Michele] still has significant challenges in managing the behaviors of her three oldest children, particularly the interaction between Jordan and Jesse. . . . Jordan has made progress in dealing with his behaviors. Kailynn's transition to her mother's care went well, but created jealousy issues for Jordan. Jesse's transition has been more difficult. Jesse needs much monitoring due to his behavior problems, apparent depression, sleep problems and guilt over an incident in foster care. [Michele] will need an indeterminate amount of time to stabilize the current family dynamic. Although it was always the plan to transition the children home one by one as each addition achieved stability, even [Michele] acknowledges now that she does not know how much time that would take.

Kerry . . . and Kimberly were placed out-of-home initially because they and their older siblings were neglected by their parents. The neglect was largely due to methamphetamine use by both parents. Although the mother now appears to be clean, Kerry . . . and Kimberly remain at risk for neglect due to circumstances in the home. The mother works full-time and relies on her parents for child care in the evenings. She still requires the regular assistance of an in-home therapist to deal with behavior issues with the three oldest children.

The past neglect of all of the mother's children has left her with a complicated family dynamic. There has been slow improvement. To the extent that the mother's past neglect of her children has contributed to the current situation, as it most certainly has, she has not been able to remedy the circumstances which caused Kerry . . . and Kimberly to be removed.

. . . .

. . . Kerry . . . has been out-of-home for about two-thirds of her five and a half years. Kimberly has been out-of-home for

10

almost half of her four years. At the time of trial, no witness could predict when the mother's situation at home with the three oldest children would be stable enough for either Kerry . . . or Kimberly to return home.

. . . The mother has been offered services for four of the past five years, throughout most of the girls' lives, but still has been unable to remedy the circumstances that caused them to be out-of-home for over fifteen months. Because of this, there is a substantial likelihood that she will not be able to exercise proper and effective parental care and control for them in the near future. This is particularly true for Kerry . . . [who has] developmental delays and special needs . . . .

Therefore, the Court finds that [ADES] proved the ground of length of time in care, as provided by A.R.S. § 8-533(B)(8)[(c)] by clear and convincing evidence.[8]

## II. Discussion

### A.

¶16        This appeal raises the novel issue of whether a juvenile court may terminate parental rights under § 8-533(B)(8)(c), based on fifteen months or longer in court-ordered, out-of-home placement, when ADES's plan of reunification contributed to and contemplated

_____

[8]After Michele and the Older Children filed their opening briefs, counsel for Kerry and Kimberly filed a "motion to strike or dismiss appeals" with regard to Kerry on the ground that Kerry had been adopted while this appeal was pending and her adoption had allegedly rendered the appeals by Michele and the Older Children moot. We denied the motion. We conclude any arguments about the effect of our decision on an order authorizing Kerry's adoption are best addressed, in the first instance, to the juvenile court, and we decline to render an advisory opinion on the issue.

11

the length of time the children would remain in care and the parent was in full compliance with the plan.[9]

**B.**

¶17     For the juvenile court to terminate Michele's parental rights pursuant to § 8-533(B)(8)(c), ADES was required to prove it had made a "diligent effort to provide appropriate reunification services" for Michele and her children, but, despite that effort, Michele had been unable to remedy the circumstances causing Kerry and Kimberly to be in court-ordered, out-of-home care for fifteen months or longer. In addition, ADES had to establish there was "a substantial likelihood that [Michele would] not be capable of exercising proper and effective parental care and control in the near future." *Id.* Each of these elements required proof by clear and convincing evidence. *See* A.R.S. § 8-863(B); *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, ¶ 25, 971 P.2d 1046, 1051 (App. 1999). In deciding whether ADES sustained its burden, the court was also required to "consider the availability of reunification services to the parent and the participation of the parent in these services." § 8-533(D).[10]  Michele and the Older Children contend ADES failed to sustain its burden of proving that: (1) ADES diligently had provided appropriate services designed to reunite Michele with Kerry or Kimberly, (2) Michele had failed to

---

[9]Because this question has not been squarely addressed in published opinions, we ordered supplemental briefing to afford the parties an opportunity to address it.

[10]ADES was also required to prove, by a preponderance of evidence, that termination of Michele's parental rights was in the best interests of Kerry and Kimberly. *See Kent K. v. Bobby M.*, 210 Ariz. 279, ¶ 22, 110 P.3d 1013, 1018 (2005).

remedy the circumstances causing Kerry and Kimberly to remain in out-of-home care, or (3) there was a substantial likelihood that Michele would be unable to parent either of the girls in the near future. We address each of these arguments in turn.

**C.**

¶18 The juvenile court, as the trier of fact in a termination proceeding, "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, ¶ 4, 100 P.3d 943, 945 (App. 2004). Accordingly, we view the evidence and reasonable inferences to be drawn from it in the light most favorable to sustaining the court's decision, *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, ¶ 13, 53 P.3d 203, 207 (App. 2002), and we will affirm a termination order that is supported by reasonable evidence. *Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555, 944 P.2d 68, 70 (App. 1997). We do not reweigh the evidence. *See Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, ¶ 13, 107 P.3d 923, 927 (App. 2005). When the statutory grounds for termination are challenged, we will affirm a termination order "'unless we must say as a matter of law that no one could reasonably find the evidence [supporting statutory grounds for termination] to be clear and convincing.'" *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, ¶ 10, 210 P.3d 1263, 1266 (App. 2009), *quoting Murillo v. Hernandez*, 79 Ariz. 1, 9, 281 P.2d 786, 791 (1955).

**D.**

**1. Diligent efforts to reunify.**

**¶19** As the agency responsible for the care of Michele's children, ADES had statutory and constitutional obligations to make reasonable efforts to reunify this family. *See Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, ¶ 37, 152 P.3d 1209, 1216 (App. 2007); *Mary Ellen C.*, 193 Ariz. 185, ¶ 33, 971 P.2d at 1053 ("Arizona courts have long required the State . . . to demonstrate that it has made a reasonable effort to preserve the family."); § 8-533(B)(3). Neither Michele nor the Older Children dispute that ADES provided appropriate services to reunite the four of them. But the Older Children argue that, "by design," ADES failed to make a diligent effort to reunite Kerry and Kimberly with the rest of the family. Michele agrees, citing CPS's failure to include Kerry and Kimberly in counseling with Indigas, whom CPS had retained to help Michele effectively parent her children as they were returned to her care, and its failure to expand visitation between Michele and the two girls to include longer and unsupervised visits, as contemplated by the case plan adopted at the FGDM meeting.

**¶20** Citing *Mary Ellen C.*, ADES responds that it is not required to "provide 'every conceivable service'" or to "undertake rehabilitative measures that are futile." 193 Ariz. 185, ¶¶ 34, 37, 971 P.2d at 1053, *quoting In re Maricopa County Juv. Action No. JS-501904*, 180 Ariz. 348, 353, 884 P.2d 234, 239 (App. 1994). Although these are correct statements of law, they are incomplete. As *Mary Ellen C.* also made clear, when the state has a duty to provide reunification services, "it must provide a parent with the time and opportunity to

14

participate in programs designed to improve the parent's ability to care for the child." And, although futile efforts are not required, ADES must "undertake measures with a reasonable prospect of success" in reuniting the family. *Id.*

¶21 We reject ADES's apparent suggestion that attempts to reunify Michele with Kerry or Kimberly were futile because "as early as August 2007," Joosten had "expressed concern that [Michele] would never be able to handle all five children." Joosten's concern, even if it proved to be an accurate prediction, was not clear and convincing evidence that reunification services ADES did not provide would have been "futile." *See id.* ¶ 42 (requiring ADES to "prove by clear and convincing evidence that it ha[s] made a reasonable effort to provide [the parent] with rehabilitative services or that such an effort would be futile").

¶22 Joosten acknowledged at the termination hearing that he had not provided any services designed to reunify Kerry and Kimberly with Michele, stating he "was taking each child a step at a time into the home." Indeed, Indigas testified that when she was retained to assist in reuniting the family in the spring of 2008, her work was limited to the Older Children and she had "known from the beginning" that ADES had planned to recommend termination of Michele's rights to Kerry and Kimberly.

¶23 Based on the reunification plan adopted at the FGDM meeting, ADES argues it was not required to provide reunification services for Kerry and Kimberly because "[b]y the time the older children were transitioned home, the girls had again been out of [Michele's] care for eighteen months, and there was no reasonable assurance of their

15

reunification." Quoting *In re Maricopa County Juvenile Action No. JS-501568*, ADES asserts, "'[l]eaving the window of opportunity for remediation open indefinitely . . . [was not] in [Kerry and Kimberly]'s best interests.'" 177 Ariz. 571, 577, 869 P.2d 1224, 1230 (App. 1994).[11] In its supplemental brief, ADES further contends that "stabilizing the older children was a prerequisite to returning Kerry or Kimberly," and therefore, "services directed at addressing [Michele]'s needs . . . and at stabilizing the older children *were* reunification services provided to effectuate Kerry's and Kimberly's return to [Michele]'s care."

¶24      But the Older Children contend ADES controlled the timetable for its plan to reunify Michele with each child in succession and had contemplated that reunification could not be completed without some of the children remaining in an out-of-home placement for longer than fifteen months.[12] They argue ADES fails "to undertake measures with a reasonable prospect of success when it creates a timetable for reunification in excess of

---

[11]In *Maricopa County No. JS-501568*, the court considered whether a mother's rights could be terminated because she substantially had neglected or willfully refused to remedy circumstances that caused her child to remain in a court-ordered, out-of-home placement during the first year of a dependency proceeding, *see* § 8-533(B)(8)(a) (now nine months), even though, by the time of the termination hearing, she appeared nearly ready to parent her child, precluding termination under what is now § 8-533(B)(8)(c). 177 Ariz. at 577, 577 n.2, 869 P.2d at 1230,1230 n.2. The case has little relevance to the sufficiency of ADES's effort to provide appropriate reunification services to a mother who was fully compliant with her case plan, the issue raised here.

[12]The record supports the Older Children's assertion that Michele had been able to reunite with Jordan, Kailynn, and Jesse more quickly than ADES had expected. In February 2008, Joosten had suggested a review hearing be held in August 2008, more than fifteen months after the children had been placed in out-of-home care, "to determine if any of the other children," in addition to Jordan, could be reunited with Michele.

16

[fifteen] months—and then moves for severance based on the [children's] excess time [in care]." Under the circumstances in this case, we agree.

¶25 For eighteen months, the only case plan goal approved by the juvenile court for each of Michele's children was family reunification. We appreciate the merit of the FGDM plan to place the children with Michele in succession, as a placement plan. But we are not persuaded there was sufficient evidence to support the finding that ADES made a diligent effort to reunify this family when it decided to provide reunification services successively as well. And, although stabilizing the Older Children one at a time was consistent with the case plan ADES had created and with which Michele had complied, it was only a "prerequisite" in the context of that plan. It was not empirical evidence that Michele was unable to parent Kimberly or Kerry at the time of the hearing, that there was a substantial likelihood she would be unable to parent them in the near future, or that it was futile to provide the family further reunification services.

¶26 At most, Joosten's testimony established the plan had been based on what he believed would be in the children's best interests, not whether, in the absence of ideal circumstances, Michele would be capable of parenting Kimberly or Kerry in addition to her other three children. When asked why he had recommended termination and adoption for Kerry, for example, Joosten cited Kerry's special needs and her long placement with Maureen. Asked directly whether he believed Michele had been unable to remedy the circumstances that caused Kerry to be in an out-of-home placement and whether there was a substantial likelihood Michele would not be capable of parenting her in the near future,

17

Joosten answered, "I think that Kerry . . . would be another challenge for Michele on top of the other kids," and he feared returning her to Michele's care might possibly cause Michele's parenting abilities to backslide. He also opined that, although he believed Michele "knows what's going on with Kerry[,] . . . working with Kerry [would] be a new stressor" in Michele's life.

¶27 Joosten did not express the same fears about returning Kimberly to Michele's care, however, stating she is "a normal little [three]-year-old child who needs to have connections with mom and her brothers and sisters and her extended family." He added, "Kimberly and Kerry are the princesses of the family" and Jordan and Jesse are "very protective of the two little girls . . . ." His recommendation of termination and adoption for Kimberly was based on the length of her placement and his belief that Michele "needed to put a lot of emphasis on the three older kids and support for them." When asked about Michele's ability to parent her youngest child, Joosten stated that Kimberly "would probably [be] affect[ed] . . . somehow" by "being taken away from a placement that she's been in for so long . . . ." And, when asked whether he thought it would be possible to reunify all of the children with Michele if her plan were extended for an additional six months, Joosten responded, "[A]nything is possible, but I think the best interests of the children lie in having Kimberly and Kerry where they are and having the older kids with the really one-to-one support that they need from their mom."

¶28 Joosten's observations may have been relevant to the issue of whether termination of Michele's rights was in the children's best interests, which the court could

18

only consider if there was sufficient evidence to establish a statutory ground for termination. But those observations did not provide a basis for withholding unsupervised visitation and other services designed to reunify Michele with her two youngest children. *Cf. In re Maricopa County Juvenile Action No. JS-6831*, 155 Ariz. 556, 558, 748 P.2d 785, 787 (App. 1988) ("[T]ermination cannot be predicated solely on the best interests of the child."). Nor did they render such services futile.

¶29       Moreover, as the court noted in *Mary Ellen C.*, ADES fails to make a sufficient effort to reunify a family "when it neglects to offer the very services that its consulting expert recommends." 193 Ariz. 185, ¶ 37, 971 P.2d at 1053. Although Rollins had plainly recommended that ADES retain a therapist who could provide a "direct assessment of the mother-child relationship[]" between Michele and each of her children, ADES failed to follow that recommendation and instead limited Indigas's in-home counseling, as well as Carroll's therapy sessions, to the Older Children.[13] As noted below, this failure not only impaired ADES's ability to prove the adequacy of its reunification efforts, but other elements of the time-in-care ground it had alleged as well.

¶30       ADES had an obligation to make diligent efforts to reunify Michele with all of her children, including the two youngest, during the entire time the plan goal was reunification. Instead, ADES withheld services designed to facilitate Michele's reunification

---

[13]In its supplemental brief, ADES argues it had provided family counseling with Alden Carroll to "the entire family." But, although Joosten refers to Carroll's work with "the children" in his reports, his testimony, as well as the testimony of foster care licensing agent Anabeli Miranda, clarified that these services were only provided to the Older Children.

with Kerry and Kimberly, including expanded visitation and family counseling, while waiting to see whether the Older Children could be returned successfully to her care. And, after the first three placements were made, ADES foreclosed all efforts to reunite Michele with her two youngest children by seeking to terminate her parental rights to them on the ground that, under § 8-533(B)(8)(c), the children had already been out of the home for too long. The record does not support the juvenile court's finding, by clear and convincing evidence, that ADES made a diligent effort to reunify this family.

**2. Inability to remedy circumstances.**

¶31    As this case illustrates, ADES's duty to provide appropriate reunification services and its burden of proving a parent's failure to remedy circumstances that precluded her reunification with her children are often related.[14] The purpose of providing reunification services is to afford a parent "the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Mary Ellen C.*, 193 Ariz. 185, ¶ 37, 971 P.2d at 1053. Such efforts also enable ADES to evaluate a parent's progress, or lack thereof, toward making reunification possible. Without such evaluative evidence, ADES may fall short of sustaining its burden of proving that termination of a parent's rights is warranted. *See id.*, ¶¶ 20-21, n.7 (failure to provide appropriate services resulted in witnesses' "inability

---

[14]We construe § 8-533(B)(8)(c)'s reference to "circumstances that cause the child to be in an out-of-home placement," *id.*, "'to mean those circumstances existing at the time of the severance' that prevent a parent from being able to appropriately provide for his or her children." *Marina P.*, 214 Ariz. 326, ¶ 22, 152 P.3d at 1213 (discussing termination based on § 8-533(B)(8)(a)), *quoting In re Maricopa County Juv. Action No. JS-8441*, 175 Ariz. 463, 468, 857 P.2d 1317, 1322 (App. 1993), *overruled in part on other grounds by Kent K. v. Bobby M.*, 210 Ariz. 279, ¶¶ 8-22, 110 P.3d 1013, 1016-18 (2005).

to assess [mother's] current circumstances" and ADES's inability to prove "'reasonable grounds to believe the parent's condition will continue for a prolonged, indeterminate period,'" under § 8-533(B)(3)).

¶32        Here, ADES's failure to involve either of the younger children in therapy with Carroll or Indigas—both counselors who worked with the family individually or as a unit—prevented ADES from obtaining what Rollins had recommended and ADES needed: a direct assessment of Michele's present parenting abilities and capacities with respect to Kimberly or Kerry. Like Michele, we are not certain of the evidentiary basis for the juvenile court's finding that "Kerry . . . and Kimberly remain at risk for neglect due to circumstances in the home." Indigas, the only therapist who testified about Michele's parenting abilities, stated her progress with the Older Children had been "miraculous, on a lot of levels." Although the court found Michele "still requires the regular assistance of an in-home therapist to deal with behavior issues with the three oldest children," Indigas testified Michele "ha[d] met all treatment goals and objectives and [was] ready to be discharged from the in-home program." Based only on her experience with Michele and the three older children, Indigas opined Michele would be able to parent additional children. But Indigas acknowledged that she could express no opinion about Michele's ability to parent Kimberly or Kerry, because she had never worked with those children. And, although Joosten offered

21

his opinion of what would be best for the family and challenges they might face, he never opined that Michele was unable to parent Kerry or Kimberly effectively.

### 3. Ability to parent in the near future.

¶33 There was even less evidence to support the juvenile court's determination that there was a substantial likelihood Michele "[would] not be able to exercise proper and effective parental care and control . . . in the near future." The court stated in its order that "no witness could predict when the mother's situation at home with [the] three oldest children would be stable enough for either Kerry and or Kimberly to return home." The only evidence of an unstable situation at home related to Jesse's progress in making a suitable adjustment. We agree with the Older Children that the inability to predict how long Jesse's adjustment might take falls short of clear and convincing evidence of a substantial likelihood that Michele would be unable to care for Kimberly or Kerry, or both, in the near future. It is not a parent's burden to prove she will be capable of parenting effectively in the near future, but ADES's burden to prove there is a substantial likelihood she will not. At most, the evidence established only that no one could predict when Jesse would be stabilized and when Kimberly, and later Kerry, could be returned to Michele's care in accordance with the FGDM plan. We conclude that, as a matter of law, this did not constitute clear and convincing evidence there was a substantial likelihood Michele would be unable to care for Kimberly or Kerry, or both, in the near future.

¶34 At oral argument, ADES asserted Michele had "freely admitted that she was not able to take on another child" when the termination hearing was held in December 2008.

22

But the only testimony that supports this assertion was made in the context of ADES's plan to return Kimberly, and then Kerry, only after Jesse appeared to be stable. During cross-examination by ADES, Michele stated:

> Q. Jordan was returned to you this year about April of 2008?
>
> A. Yes.
>
> Q. And he seemed to have stabilized pretty well, do you agree?
>
> A. Yes.
>
> Q. And then Kailynn came home to you about July of this year?
>
> A. Yes.
>
> Q. And you feel she has stabilized?
>
> A. Yes.
>
> Q. And then Jesse came home to you in about September?
>
> A. Yes.
>
> Q. Do you believe that he has stabilized yet?
>
> A. No, not at this point.
>
> Q. How much longer do you think it will take for Jesse to stabilize to the family of four that you have now?
>
> A. I cannot say that because I don't know. But I'm sure, with the proper services in place, he'll get evaluated and

find out what actually is going on in his mind and we'll take it from there.[15]

In contrast, when asked directly about her ability to parent Kimberly and Kerry, Michele responded as follows:

> Q.   Do you think, with the responsibilities that you have with your other three children and if Kerry were in the home, that you would be able to give Kimberly the kind of attention that she needs to keep her safe—
>
> A.   Oh, yes.
>
> Q.   —and nurtured?
>
> A.   Yes.

And, although ADES asserted at oral argument that there had been "extensive testimony that [Michele] was not going to be able to meet Kerry's special needs," the witnesses whose testimony ADES relied on had testified only generally about the challenges any parent would face in raising Kerry and offered no opinion about whether Michele, specifically, could meet those challenges.[16]

_____

[15]Michele stated she had requested an evaluation for Jesse, but her telephone calls to arrange the evaluation and additional services had not been returned. Maureen testified Michele had requested a psychiatric evaluation for Jesse at a child and family team meeting in October 2008, but the evaluation had not yet been performed by the following meeting in December, "even though it[ had] been [two] months since the mother brought it up."

[16]At oral argument, ADES relied on the testimony of Maureen; Kerry's kindergarten teacher, Wendy Parks; and her speech pathologist, Barbara Pickard. But although there was testimony that the challenges of parenting Kerry might be greater for a parent who worked outside the home or had other children to raise, none of them opined that Michele would be an inadequate parent. For example, when asked whether Michele could parent Kerry with the other children in the home, Maureen responded,

24

¶35 As ADES points out, this court has held in other cases that a parent's ability "to meet the needs of one or more of her children . . . does not establish that she is able to parent all of her children." *See In re Pima County Juv. Action No. S-2460*, 162 Ariz. 156, 158-59, 781 P.2d 634, 636-37 (App. 1989) (finding parent "barely capable of parenting the . . . children presently in her care and [was] incapable of dealing with the [other children's] special needs"); *In re Maricopa County Juv. Action Nos. JS-5209 and JS-4963*, 143 Ariz. 178, 187, 692 P.2d 1027, 1036 (App. 1984) (finding stress of parenting additional children would exacerbate mother's mental illness). But in those cases, substantial evidence had been presented to establish an inability to parent effectively. *See Pima County Juv. Action No. S-2460*, 162 Ariz. at 157, 781 P.2d at 635 ("The common thread of the witnesses' testimony was that the natural mother could barely cope with the five children presently living with her, and that she was unable to meet the special needs of G. and V."); *Maricopa County Juv. Action Nos. JS-5209 and JS-4963*, 143 Ariz. at 186-87, 692 P.2d at 1035-36 (juvenile court relied on expert medical testimony that "mother's mental condition and . . . ability to

> Quite frankly, I don't think I could handle [Kerry's] needs . . . with the other children in the home. I think [she] needs a lot of one-on-one attention, and with the kind of attention that she needs, it would be a strain for anyone, more of a strain for a full-time working mother, so I think it would be difficult for any mother to handle that.

Similarly, when foster care licensing agent, Anabeli Miranda, was asked whether Kerry would benefit from being in a family having five children, she stated, "[T]he caregiver has to be really on top of any little changes . . . ." But she expressed no opinion about Michele's ability or inability to do so. And Parks and Pickard testified about Kerry's need for one-on-one attention and their daily communications with Maureen, but they offered no opinion about Michele's abilities.

25

discharge her parental responsibilities would deteriorate under even moderate stress" and "stress . . . would increase with the number of children in her care," creating high potential for abuse and neglect if children returned). No such evidence has been presented here.

¶36 Our conclusion is unchanged by the juvenile court's concern that, because this is the second dependency proceeding for this family, the children have been in out-of-home placements for far longer than the fifteen cumulative months required to terminate a parent's rights under § 8-533(B)(8)(c). Although this history is indisputably unfortunate, we cannot agree that it provides clear and convincing evidence of a substantial likelihood Michele will be unable to parent Kimberly or Kerry in the near future. The mere passage of time during which a child is in care, without more, is not a ground for terminating the parent's rights under § 8-533(B)(8)(c). And we do not believe additional time in care may be considered a proxy for the independent findings the statute requires.

### III. Conclusion

¶37 For the foregoing reasons, we conclude the juvenile court erred in finding ADES had presented clear and convincing evidence that it had made a diligent effort to reunify Michele with Kerry or Kimberly or that there is a substantial likelihood that Michele will be unable to parent either of the girls in the near future. Accordingly, we reverse the court's order terminating Michele's parental rights to Kerry and Kimberly.

_____
GARYE L. VÁSQUEZ, Judge

26

CONCURRING:

_____
PETER J. ECKERSTROM, Presiding Judge


_____
J. WILLIAM BRAMMER, JR., Judge