NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

WAYNE W., PATRICIA B., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, L.W., B.W., *Appellees.*

No. 1 CA-JV 17-0309
FILED 3-20-2018

Appeal from the Superior Court in Maricopa County
No. JD529211
The Honorable Timothy J. Ryan, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant Father*

Robert D. Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Mother*

Arizona Attorney General's Office, Phoenix
By Amber E. Pershon
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Paul J. McMurdie joined.

---

**C A M P B E L L**, Judge:

¶1        Appellants Wayne W. ("Father") and Patricia B. ("Mother") appeal the juvenile court's order terminating their parental rights to their children, a son and daughter. On appeal they each challenge the court's finding of the statutory ground of fifteen months in an out-of-home placement.[1] For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND[2]

¶2        In September 2015, DCS took temporary custody of the children and filed a dependency petition. In the petition DCS alleged neglect by both Father and Mother (collectively, the "parents") for "failing to provide the children with the basic necessities, specifically stable housing" and "leaving [the children] in the care of inappropriate caregivers." DCS also alleged that the parents were homeless and Mother's medical issues negatively impacted her ability to parent. That same month the juvenile court granted the petition and adjudicated the children dependant as to Father and, a few months later, adjudicated the children dependant as to Mother.

---

[1] Father also challenges the juvenile court's finding of the statutory ground of mental illness, but because we affirm based on fifteen months in an out-of-home placement, we do not address this issue. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 27 (2000). Neither Father nor Mother challenge the juvenile court's best interests findings.

[2] We view the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to sustaining the juvenile court's termination order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).

¶3           In January 2017, DCS moved for termination of Father's and Mother's parental rights. DCS alleged inability to discharge parental duties due to mental illness, Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(3), and fifteen months in an out-of-home placement, A.R.S.  § 8-533(B)(8).[3] The juvenile court held a contested severance hearing.[4] At the time of the hearing, the children had been in an out-of-home placement for about 20 months.

¶4           DCS initiated the dependency after receiving various reports regarding the children. On July 25, 2015, the day after their daughter was born, DCS received reports that Father and Mother were neglecting both children. The hospital reported the daughter was born substance exposed to morphine. Mother disclosed to the DCS caseworker that she had been diagnosed with various health conditions, including several mental health conditions.

¶5           DCS also received reports expressing concern regarding Father and Mother's friends, C.C. and E.C (the "roommates"), including that at the hospital the roommates were referring to themselves as the daughter's parents. Staff at the hospital reported the male roommate had been urinating in  a corner of the daughter's hospital room. DCS received additional reports that Father and Mother were permitting the roommates to sleep in the same bed as the two-year old son. DCS learned that Father and Mother were living with the roommates prior to the birth of the daughter. DCS also discovered the male roommate had previous involvement with DCS based on allegations of sexual abuse of a child. By September 2015, at the time DCS initiated the dependency, Father and Mother were homeless with a two-year-old son and a two-month-old daughter.

¶6           At the contested severance hearing, Mother testified that following the filing of the dependency they moved in with another couple in a home environment she admitted "wasn't a safe environment for [the] children." Mother claimed the couple was not the same prior roommates, but DCS disputed whether the couple was in fact the same roommates they resided with prior to the dependency. Despite Mother's admission

_____

[3] We cite to the current version of all statutes cited in this decision, which have not been materially amended since the severance hearing.

[4] DCS later dropped the ground of mental illness regarding Mother at the contested severance hearing.

regarding the safety of the home, they lived there until a month and a half before the hearing. [5]

¶7          Father and Mother then moved out of the couple's residence and signed a 12-month lease for a two-bedroom apartment. The signing of a lease did not abate DCS's concerns regarding their ability to provide suitable and safe housing. For example, Father admitted there were still "issues" that needed to be resolved with the apartment.[6] Most concerning to Jillian McCarthy, a DCS supervisor who was their initial caseworker and still involved in the case in a supervisory capacity, was that it had taken Father and Mother almost the entire 20 months of the dependency action to obtain housing and there were concerns regarding the safety of the home, given the parent's admission the apartment still had issues at the time of the hearing.

¶8          McCarthy also testified the parents had been unable to establish their financial ability to sustain the lease long term. She explained she was concerned because they were only able to obtain the apartment after Mother received a settlement check from a car accident. She further opined that the parents had been unable to demonstrate, through Father's pay stubs, how they would be able to maintain the apartment long term with Father's pay. Mother admitted she was unemployed and Father testified he was working less than 30 hours a week.

¶9          DCS presented evidence that throughout the dependency it provided an array of reunification services, including individual counseling, two parent aide referrals that closed out unsuccessfully due to parent's inability to obtain stable housing, visitation, drug testing and assessment, and mental health evaluations. Yet DCS continued to be concerned about the parents' mental health, as discussed more below. McCarthy opined that even with all the services provided, both parents "demonstrated a lack of behavioral change with regards to mental health, basic needs, safe and stable housing, [and] stability." Based on her

---

[5] A DCS report raised concerns regarding neglect and safety issues at the residence, such as issues regarding how the couple stored and used medical marijuana, and a report that Mother had an argument with one of the individuals and became so scared she locked herself in the bathroom.

[6] DCS presented testimony and evidence that Father and Mother previously claimed they had purchased appropriate housing in Miami, Arizona, which only needed some minor repairs, but the house had no electricity or running water.

observations, she concluded neither Father nor Mother had made the changes necessary to remedy the circumstances causing the out-of-home placement, nor would they be able to parent in the future because they had not taken the dependency seriously.

¶10 The juvenile court found by clear and convincing evidence the statutory ground of mental illness regarding Father. It also found fifteen months in an out-of-home placement, as to both Father and Mother. After finding by a preponderance of evidence that termination of Father's parental rights and Mother's parental rights was in the children's best interests, the court terminated their parental rights.

## DISCUSSION

¶11 We will not reverse the juvenile court's termination order "unless no reasonable evidence supports its factual findings." *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 16 (App. 2016) (citation omitted). The juvenile court sits as the trier of fact, and this court will not reweigh the evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). To terminate a parent's parental rights the juvenile court must find at least one statutory ground under A.R.S. § 8-533 by clear and convincing evidence, A.R.S. § 8-537(B), and by a preponderance of evidence that termination is in a child's best interests, *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005).

¶12 Termination of parental rights based on fifteen months in an out-of-home placement requires the juvenile court to find the ground by clear and convincing evidence. A.R.S. § 8-537(B). Accordingly, the juvenile court must find that "the child has been in an out-of-home placement for a cumulative total period of fifteen months or longer" nonetheless "the parent has been unable to remedy the circumstances" which caused the out-of-home placement, and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). Circumstances means "those circumstances existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Jordan C.*, 223 Ariz. at 96 n.14, ¶ 31 (citation omitted). The juvenile court must also find DCS has made diligent efforts to provide appropriate reunification services. A.R.S. § 8-533(B)(8). It must further consider the availability of reunification services and the parent's participation in the services. A.R.S. § 8-533(D).

## I.  Fifteen Months in an Out-of-Home Placement—Diligent Efforts

¶13      Father challenges the juvenile court's finding that DCS made diligent efforts to provide reunification services. He argues the psychological services provided by DCS were inadequate because DCS should have provided him with more counseling sessions to work through his severe trauma.[7]

¶14      Section 8-533(B)(8) requires DCS to make diligent efforts to provide appropriate reunification services. This means DCS "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Jordan C.*, 223 Ariz. at 94, ¶ 20 (citation omitted). DCS is not required to make futile efforts, but it "must undertake measures with a reasonable prospect of success" in reuniting the family. *Id.* (citation omitted).

¶15      Here, DCS provided Father a psychological evaluation resulting in a diagnosis of a personality disorder with narcissistic personality traits. A course of treatment was recommended, a minimum of six months individual therapy with a doctorate level psychologist, "or as long as the provider deems necessary." Within a few weeks, DCS referred Father for the recommended doctorate level services with Dr. Heather De Solar.

¶16      In June 2016, De Solar provided Father with individual counseling for about six months to address the issues clarified by this diagnosis. After 20 sessions, De Solar informed DCS she did not recommend further individualized counseling. Instead she recommended a psychiatric evaluation, which DCS provided. Unaware Father had already completed anger management, she also recommended anger management counseling, which DCS again provided.

¶17      De Solar testified that despite being compliant with therapy, Father made minimal progress. She attributed this in part to his narcissistic

---

[7] DCS argues that Father has waived this argument because he did not raise this argument before the severance hearing. Father raised this argument at the severance hearing, and the juvenile court found that he had challenged the adequacy of DCS's services in its termination order. We therefore decline to find waiver. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.,* 234 Ariz. 174, 178, ¶ 14 (App. 2014).

personality disorder and that Father was engaged in "a lot of denial" including claiming "he [didn't] really need much help with parenting." Thus, despite Father being generally "open and compliant" he was not "making the deeper behavioral changes" to make the kind of progress necessary for reunification. Even at the hearing, Father continued to deny the need for change. He stated that he did not agree he had "narcissistic tendencies" and that he had "always been able to provide for [his] children and [he] will continue to do so." De Solar testified that she believed she provided as much help as she could, given Father's resistance and denial of the need for assistance. As a result, she discontinued treatment.

¶18 At the hearing DCS also expressed additional concerns regarding Father's ability to manage his anger, and his prior child abuse conviction. Father previously pled guilty to duct taping together a child's legs and hands, as well as putting duct tape across his mouth for five hours, with Mother present. Yet despite his plea and completing anger management following the conviction, Father and Mother both denied that he used duct tape or that it was for a period of five hours.

¶19 The juvenile court found that Father was resistant to engaging in services and did not "obtain insight" from individualized counseling. Given De Solar's testimony and that DCS followed through with the recommended mental health services, we conclude reasonable evidence supports the juvenile court's finding that DCS made diligent efforts to provide appropriate reunification services. *Cf. Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶¶ 35-36 (App. 1999).

## II.     Inability to Remedy Circumstances and Parental Care

¶20 The parents do not dispute that the children had been in DCS's care for over fifteen months. They both challenge the juvenile court's findings regarding inability to remedy the circumstances which caused the out-of-home placement in the first place and a substantial likelihood of inability to exercise proper and effective parental care and control in the near future.

¶21 Both parents' ability to obtain and maintain safe housing and to ensure that they only permit safe individuals around the children has been a primary concern throughout the dependency. Here, the juvenile court concluded both parents had failed to address the lack of stable housing. The juvenile court also found they again moved in with the "same" inappropriate roommates "involved in the circumstances that led to the removal of the children in the first instance" and did not move out

until shortly before the severance hearing. While the record reflects some uncertainty as to whether the roommates were in fact the same roommates they resided with prior to the dependency, given Mother's admission that the residence was unsafe, the record clearly reflects reasonable evidence supporting the juvenile court's finding that Father and Mother were engaged in the same conduct—unstable housing and inappropriate roommates—that led to the initial removal of the children. *Supra* ¶¶ 5-7.

¶22        Although Father and Mother did eventually sign a 12-month lease on their own, this was a recent development and did not negate the previous 20 months of housing instability. Mother also acknowledged she had been unemployed throughout the dependency and that they were only able to obtain the apartment after she received a one-time settlement check for about $12,000. Despite Mother and Father's testimony to the contrary, McCarthy testified that during the dependency DCS provided Mother and Father with information on obtaining housing, including felon-friendly housing resources. This court does not reweigh the evidence, including the juvenile court's credibility determinations. *See Jennifer S.*, 240 Ariz. at 287, ¶ 16.

¶23        Mother additionally claims the juvenile court erred in finding the ground of fifteen months because she had "addressed her mental health issues." The record, including Mother's own testimony, demonstrates otherwise.

¶24        At the start of the dependency, Mother reported to DCS that she had been diagnosed with several mental illnesses. DCS had concerns regarding how Mother's mental health affected her ability to parent throughout the dependency. DCS provided Mother with mental health services, including a psychological evaluation, a psychiatric evaluation, and individual therapy. Following the psychological evaluation, Mother was diagnosed with Posttraumatic Stress Disorder and maladaptive personality characteristics.

¶25        At the hearing, Mother's therapist Laurie Raymond, who provided Mother with individual counseling for about six months, testified Mother had been "motivated" and was "making progress" in therapy.[8] Mother, however, admitted that later in the dependency a hotline referred

---

[8] Although Raymond requested that DCS extend the referral for more counseling, DCS did not. After a delay in Raymond submitting the correct extension paperwork, DCS eventually recommended that Mother obtain her own therapy services.

her to a seriously mentally ill ("SMI") clinic and she initially directed the clinic not to disclose the contact or potential SMI diagnosis to DCS. Thus, DCS did not learn until a month before the severance hearing, in April 2017—well over a month after Mother received services from the clinic—that Mother had been to the SMI clinic.

¶26 Despite Mother's mental health being one of DCS's central concerns, Mother testified she was "not aware that [she] needed to" disclose the services at the SMI clinic, also testifying she was unaware that her mental health was one of the reasons DCS had not returned the children. Mother also admitted she had missed appointments with the SMI clinic, which McCarthy confirmed upon contacting the clinic. McCarthy testified that it "[a]bsolutely" would have been helpful for DCS to have this information because "[i]f a parent is deemed SMI, it opens up a lot more doors with regards to services." Further, McCarthy testified Mother's failure to engage in SMI services impacted her ability to parent in the future. As such, reasonable evidence supports the juvenile court's finding that "Mother ha[d] been resistant to counseling, including counseling [she] sought out on her own."

¶27 Accordingly, based on this record, reasonable evidence supports the juvenile court's finding that DCS had proven by clear and convincing evidence the ground of fifteen months in an out-of-home placement with respect to both Father and Mother.

## CONCLUSION

¶28 For the foregoing reasons, we affirm the juvenile court's termination order.



9