NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

ANDRAY L., *Appellant,*

v.

DEPARTMENT OF CHILD SAFETY, X.L., M.L., *Appellees.*

No. 1 CA-JV 18-0343
FILED 3-7-2019

Appeal from the Superior Court in Maricopa County
No. JD30721
The Honorable Jeanne M. Garcia, Judge

**AFFIRMED**

COUNSEL

Denise L. Carroll Esq., Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee*

**MEMORANDUM DECISION**

Presiding Judge David D. Weinzweig delivered the decision of the Court, in which Judge Kent E. Cattani and Judge James P. Beene joined.

**W E I N Z W E I G**, Judge:

¶1            Andray L. ("Father") appeals from the juvenile court's order terminating his parental rights to X.L. and M.L.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2            Father and Amy B. ("Mother") are the natural parents of X.L., born in August 2006, and M.L., born in July 2007; and two more children not subject to this appeal, A.L., born in October 2008, and D.L., born in February 2010.[1]

¶3            X.L. and M.L. have special medical needs.  X.L. has autism, ADHD and bipolar disorder.  He has exhibited violent and sexualized behaviors and requires ongoing treatment to address these issues.  M.L. has autism, unspecified bipolar disorder, and schizoaffective or unspecified psychotic disorder.  She has suffered "meltdowns," thrown furniture at school, and becomes "violent and destructive" when unmedicated.  Both children are "fully dependent" on adult care and require "structure, consistency, and significant ongoing care."  Both children receive services from the Division of Developmental Disabilities ("DDD"), including physical, occupational and speech therapy.

¶4            The Department of Child Safety ("DCS") received a series of reports starting in 2007 that Mother and Father were neglecting the children and not meeting their basic needs.  DCS investigated and found squalid living conditions.  The family house was filthy and cluttered; it emanated "a strong chemical smell" and "smells of garbage and trash."  The children were constantly dirty, smelled bad and riddled with bedbug bites.

¶5            The problems persisted and worsened.  In December 2014, DDD providers visited the house to administer therapeutic services to X.L. and M.L., but ultimately refused to enter based on its filthy condition and strong, foul odor.  DCS then assigned two family preservation teams, one in December 2014 and another in April 2015.  The parents failed to successfully complete services in the first referral, and Father refused to engage in services in the second.  When a DCS specialist inspected the house on June 19, 2015, the specialist observed "garbage on the floor, roaches roaming freely, litter boxes filled and surrounded by excrement, and animal feces on the living room sofa."  The specialist returned three

---

[1]      The juvenile court terminated Mother's parental rights to X.L and M.L. but she is not a party to this appeal.

days later. Father was "upset and angry," told the specialist to leave and stressed that DCS was no longer welcome in his home.

¶6 DCS took temporary custody of the children on June 25, 2015, and filed a dependency petition, alleging the children were dependent due to abuse and neglect.[2] DCS then learned the children were not receiving their prescribed medications or attending therapy. DCS also observed X.L. was "underweight and used foul language" and "[b]oth children self-harmed and were violent."

¶7 DCS offered a variety of family-reunification services, including a parent-aide referral, a case aide for supervised visitation, multiple psychological and psychiatric evaluations, individual counseling, and bonding and best-interests evaluations. DCS also referred Father and Mother to specialized parenting classes, focused specifically on teaching them how to properly care for and meet the special needs of X.L. and M.L. Neither Father nor Mother participated. Father claimed he did not do well in a classroom environment; he preferred Mother attend and then educate him. And neither parent followed up with the outreach coordinator to enroll in the program.

¶8 Father and Mother participated in other services with varied success. They successfully finished parent-aide services, participated in individual counseling and made improvements to the condition of the home. Given the special needs of X.L. and M.L., however, DCS remained concerned about Father's ability to effectively parent them.

¶9 Father received a pair of psychological evaluations. Both psychiatrists concluded that X.L. and M.L. "could not be safely returned home until Father completed the services." Father was diagnosed with Anti-Social Personality Disorder and ADHD; doctors recommended he participate in a psychiatric evaluation, individual therapy and a bonding assessment. Father participated in a psychiatric evaluation, where the doctor recommended he obtain ADHD medications. Father refused.

¶10 Father participated in two bonding and best-interests evaluations. In the first evaluation, the psychologist found the family

---

[2] DCS had also removed Father's two youngest children, A.L. and D.L., neither of whom had special needs. The two children were reunified with Father and Mother in March 2017; however, DCS remained concerned for their welfare, noting signs of neglect and that Father refused to allow DCS to inspect the home.

"lacked a nurturing or emotional bond" and noted that "Mother was more open to learning ways to improve while Father was defensive; [yet] they both minimized the reasons for the children's removal." The psychologist further noted that autistic children require structure, "an area where Mother and Father struggle" and gave a "poor to fair" prognosis that the parents could demonstrate adequate parenting skills in the near future.

¶11 The second evaluation was disrupted by Father's belligerent conduct. The psychologist ended the clinical interview "based on Father's deviance, anger, and lack of cooperation." During the observation period, however, the psychologist noticed that Father was "disengaged with the children." The psychologist concurred with the earlier assessment of "a weak bond with the parents and a poor prognosis for minimally adequate parenting skills." In addition, the psychologist opined it would be "counter therapeutic" to remove X.L. and M.L. from their foster homes because they were "thriving there and not much had changed from the last assessment 14 months earlier."

¶12 In February 2018, DCS moved to terminate Father's parental rights to X.L. and M.L. on the ground of fifteen months' time in care under A.R.S. § 8-533(B)(8)(c).

¶13 A three-day severance hearing ensued in June 2018. The parties offered several exhibits into evidence, and five witnesses testified, including Mother and Father, the DCS case manager, and two examining psychologists. The court issued a detailed ruling in August 2018, finding that DCS had proven the statutory ground of fifteen months' time in care by clear and convincing evidence and termination was in the children's best interests. Accordingly, the court terminated Father's parental rights to X.L. and M.L.

¶14 Father timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution, A.R.S. §§ 8-235(A), 12-2101(A)(1) and Arizona Rule of Procedure for the Juvenile Court 103(A).

**DISCUSSION**

¶15 To terminate parental rights, a court must find clear and convincing evidence of at least one statutory ground in A.R.S. § 8-533(B) and that termination is in the child's best interests by a preponderance of the evidence. *Jeffrey P. v. Dep't of Child Safety*, 239 Ariz. 212, 213, ¶ 5 (App. 2016). We will affirm a severance order unless it is clearly erroneous, and we accept the court's factual findings unless no reasonable evidence

supports them. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

### A. Fifteen Months' Time-in-Care

**¶16** Severance based upon fifteen months' time-in-care under A.R.S. § 8-533(B)(8)(c) requires proof that (1) the child has been placed in out-of-home care for at least fifteen months; (2) DCS "has made a diligent effort to provide appropriate reunification services"; (3) "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement"; and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." The relevant circumstances are those "existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 96, ¶ 31, n.14 (App. 2009) (quotation omitted).

**¶17** Father challenges only the fourth element on appeal. He argues the court erred in finding a substantial likelihood he would be unable to parent effectively in the near future. We disagree. The record contains reasonable evidence to support the court's finding.

**¶18** The juvenile court found the primary circumstance causing the children's out-of-home placement was Father's inability to provide for their "medical, mental, and behavioral needs associated with their autism diagnosis" and that Father had failed to remedy that circumstance. Father consistently placed his own needs and desires before his children and did not meet their special behavioral needs, including the structure that children with autism require. Additionally, he failed to "actively participate in [the] active care of the children during visits." The court recognized that 36 months had already passed without successful reunification, finding it substantially unlikely Father would be capable of providing proper and effective parental care in the near future. This finding is consistent with the opinions of the medical professionals who evaluated Father; and supported by evidence of Father's resistance to treating his own mental health and refusal to participate in parenting classes focused on X.L. and M.L.'s special needs.

**¶19** Father claims he made "behavioral changes" and points to "his significant participation in services" as demonstrating his ability to parent effectively. But the juvenile court heard and weighed this evidence and argument, and still terminated Father's parental rights. We do not reweigh the evidence on appeal. *Jesus M.*, 203 Ariz. at 282, ¶ 12; *see Ariz.*

*Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 336, ¶ 14 (App. 2004) ("Our task for factual findings is solely to confirm that there is some reasonable evidence in the record to sustain them."). Because reasonable evidence supports the court's finding, we will not disturb it.

### B. Best Interests

¶20 Father also disputes that termination of his parental rights is in the children's best interests, asserting the children loved him, wanted to return home and were unlikely to be adopted.

¶21 Termination is in a child's best interest if the child "would derive an affirmative benefit from termination or incur a detriment by continuing in the relationship." *Oscar O.*, 209 Ariz. at 334, ¶ 6. Factors supporting termination include that the child is adoptable, an adoptive placement is immediately available and that the existing placement is meeting the child's needs. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010).

¶22 The juvenile court found the children would benefit from termination and suffer a detriment if returned to Father's care. Reasonable evidence supports the court's finding. X.L. and M.L.'s needs were being met by their respective placements and termination would allow DCS to find "permanent homes for [the children]" where their needs would be met. The case manager testified both children were adoptable despite their special needs. X.L.'s foster family expressed an interest in adopting him, although they wanted to see whether his behavior would improve, as predicted, after contact was ended with Father. M.L.'s placement likewise expressed an interest in adopting her. Moreover, as the psychologist noted in the second bonding and best-interests evaluation, the children were likely to regress behaviorally if severance was denied because Father had demonstrated he was unable to meet their significant special needs. Reasonable evidence supports the court's finding.

### CONCLUSION

¶23 We affirm.

