NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MARSHA M., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, L.M., C.M., *Appellees.*

No. 1 CA-JV 18-0237
FILED 3-19-2019

Appeal from the Superior Court in Maricopa County
No. JD527147
JS518572
The Honorable Arthur T. Anderson, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By David C. Lieb
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

## MEMORANDUM DECISION

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Kent E. Cattani joined.

**P E R K I N S**, Judge:

¶1        Marsha M. ("Mother") appeals the superior court's order terminating her parental rights to her two children.  For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2        Mother suffers from bipolar and anxiety disorders. In September 2013, Mother tested positive for methadone, opiates, and benzodiazepines at L.M.'s birth. The Department of Child Safety ("DCS") took custody of L.M. and petitioned the superior court for a dependency finding. The court eventually found L.M. dependent and set a case plan of family reunification. Over the next four and a half years, DCS referred Mother for services, including substance-abuse testing and treatment, three psychological evaluations, a bonding assessment, counseling, three parent-aide referrals, and visitation. Mother also obtained mental-health services through Lifewell.

¶3        Mother initially struggled with addressing her mental health and with parenting L.M. In March 2014, Mother was hospitalized for fourteen days for displaying paranoia and delusions. The next month, Mother completed her first psychological evaluation with Dr. James Thal. He gave Mother a guarded prognosis of her ability to parent L.M. in the future and recommended that she attend individual therapy. Accordingly, she attended some counseling after October 2014.

¶4        Meanwhile, Mother successfully completed her first parent-aide service. The parent aide expressed concern, however, because Mother appeared lethargic and unfocused at some visits. The parent aide suggested DCS assign a safety monitor if Mother regained custody of L.M.

¶5        DCS then referred Mother for a visitation-only parent aide. Visits took place at an apartment Mother shared with Oliver A. ("Father"). The juvenile court would later terminate Father's parental rights. On appeal, Father's counsel filed a notice stating he could not find any non-frivolous issue and we subsequently dismissed Father's appeal. *See* Ariz.

R.P. Juv. Ct. 106(G). The first parent aide reported that Mother appeared tired and "dazed" and would often watch TV rather than interact with the children. She also noted that Mother failed to redirect L.M. when she would get into Mother's medications and various trinkets in the home. The parent aide also expressed concern with Mother's ability to independently parent L.M.

**¶6** In May 2015, the superior court changed the case plan to termination and adoption and DCS moved to terminate Mother's parental rights on the grounds of substance abuse and fifteen months' time in care. One month later, Mother gave birth to C.M. and DCS took custody of him. C.M. was born substance exposed; Mother struggled with an addiction to prescription pills until August 2015, but thereafter completed a treatment program and maintained sobriety through the termination hearing.

**¶7** In August 2015, Mother completed a second psychological evaluation with Thal. Thal reported that Mother had "made relatively little progress since her previous evaluation." He gave Mother a poor prognosis of being able to parent her children in the foreseeable future, and he concluded that her "drug addictions and bipolar disorder [render her] incapable of providing safe and effective care to a child." He also noted that any child in her care would be at a substantial risk for neglect and "could be exposed to frightening levels of emotional instability."

**¶8** In June 2016, Mother completed a third psychological evaluation; this time with Dr. Joseph Bluth. Bluth confirmed Mother's bipolar disorder and further diagnosed her with an unspecified personality disorder with antisocial and dependent traits. Bluth gave Mother a poor prognosis for parenting the children in the foreseeable future. He concluded a child in her care would be at risk for neglect and recommended "alternative permanency plans."

**¶9** That same month, Bluth also performed a bonding and best interests assessment between Mother and L.M. Bluth determined that they shared a bond, but it was not a strong one, and recommended termination and adoption for L.M. Meanwhile, Mother successfully completed her second full parent-aide service. That parent aide was concerned, however, about Mother's ability to independently parent the children and recommended that visits remain supervised.

**¶10** In April 2017, Mother moved into her own apartment. Around this same time, Mother enrolled in counseling through Lifewell. DCS amended its termination motion regarding L.M. to include the mental-illness ground. It later moved to terminate Mother's parental rights to C.M.

under the grounds of fifteen months' time in care and inability to parent due to mental illness.

¶11 In May 2017, Mother moved to have DCS return the children to her under Arizona Rule of Procedure for the Juvenile Court 59. At the ensuing hearing, DCS agreed that Mother had engaged in services, but opposed her motion because she had still not demonstrated that she could provide appropriate supervision or meet the children's special needs. For example, L.M. displayed anxiety and sexualized behaviors and was diagnosed with post-traumatic stress disorder. C.M. has multiple medical diagnoses, is developmentally delayed, and requires weekly therapy and a very restrictive diet. To this point, Mother had attended very few of the children's numerous medical or therapy appointments, or the child and family team ("CFT") meetings. Even when she did attend CFT meetings, she struggled to recall or understand medical diagnoses or instructions given to her.

¶12 Ultimately, Mother withdrew her motion, and the court continued the termination hearing to allow Mother more time to demonstrate whether she could safely parent the children and meet their needs on her own. After that, Mother attended many of the children's appointments and CFT meetings. Upon court order, DCS also provided Mother with a third parent aide. This parent aide reported that Mother failed to redirect the children in hazardous situations, such as attempting to eat a glow stick, touching a hot stove, or microwaving a metal lunch box.

¶13 The superior court held a contested termination hearing over three days in February and two days in March, 2018. The court eventually terminated Mother's parental rights to both children under grounds of inability to parent due to mental illness and fifteen months' out-of-home placement, but found that DCS failed to prove the substance abuse ground. The court also found termination would be in the children's best interests because Mother was unable to meet their special health, developmental, and emotional needs. Mother timely appealed the court's order.

## DISCUSSION

¶14 Mother asserts that the court erred in finding DCS made diligent efforts to provide her with appropriate reunification services as required under the fifteen months' time-in-care ground. A.R.S. § 8-533(B)(8). She specifically argues that DCS failed to provide her with specialized instruction on the children's medical and behavioral needs or opportunities to demonstrate that she could manage those needs. Because

reasonable evidence supports the court's finding, we affirm the termination order.

¶15        We will not reverse the juvenile court's termination order "unless no reasonable evidence supports its factual findings." *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 16 (App. 2016). The juvenile court sits as the trier of fact, and this Court views the evidence and reasonable inferences drawn from it in the light most favorable to sustaining the juvenile court's decision; we will not reweigh the evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). To terminate parental rights, the juvenile court must find at least one statutory ground under A.R.S. § 8-533 by clear and convincing evidence, A.R.S. § 8-537(B), and that termination is in a child's best interests by a preponderance of evidence, *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005).

¶16        When seeking termination under the fifteen-month out-of-home placement ground, DCS must prove that it "made a diligent effort to provide appropriate reunification services" to the parent. A.R.S. § 8-533(B)(8). DCS must show that it provided the parent with "the time and opportunity to participate in programs designed to help her become an effective parent." *In re Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). DCS need not "provide every conceivable service or . . . ensure that a parent participates in each service it offers." *Id.*

¶17        Mother did not raise concerns over the adequacy of services until June 2017—almost four years after L.M.'s birth and two years after C.M.'s birth. She struggled with drug addiction and with stabilizing her mental health until about August 2015. Thereafter, to her credit, Mother established sobriety and regularly participated in services. Even so, through May 2017, Mother did not take advantage of the many opportunities she had to learn about her children's special needs. The case manager explained that "those skills [could] only be learned during doctors' appointments and CFTs," both of which Mother barely attended.

¶18        Through May 2017, she failed to attend most of the children's medical and behavioral-health appointments. For example, the children's therapist, who could provide detailed knowledge about the children's medical and behavioral needs, offered to meet with Mother but Mother did not do so. Had Mother attended C.M.'s feeding therapies, she could have obtained "really specific[,] detailed information" about his diet, but Mother only attended a few.

¶19        Mother also attended only half of the CFT meetings, which are intended to "bring together all of the people that are involved in the

child's care so [they] can all talk about what's going on with the child, the child's needs, the child's current functioning, areas of concerns, and work together to try and support the child." There, several of the children's providers discussed the children's specific needs and upcoming appointments. Accordingly, in May 2017, the case manager testified that Mother still needed "to learn the certain skill sets [for the children's special needs] and be able to demonstrate that she understands how to use those skills."

¶20  The children's needs are very extensive. L.M. has substantial mental health needs, particularly from her post-traumatic stress disorder. She regularly attends counseling and shows "a variety of different trauma symptoms including hyper vigilance, exaggerated startle response, nightmares, sleep disruptions, [and] difficulty falling asleep. At times she appears to disassociate." She also becomes "highly anxious," causing extended silence or stuttering and increased toileting accidents and sleep disruptions. Since age one, L.M. has also displayed "compulsive sexualized behaviors that were outside the typical range for a child of her age." L.M.'s therapist testified that it is:

> crucial [for L.M.'s long-term mental health] that she has safety and stability and permanency and predictability within her primary care giving relationship. She will rely on that person. She needs to have a person who she feels confident [in] and can trust, . . . someone that she feels can keep her safe and can protect her from any potential dangers. And these pieces are crucial for her long-term mental health. Any -- further risk factors or exposure to violence or inconsistency or unpredictable life really puts her at further risk for developing serious mental illness as she gets older.

¶21  C.M. has long-term medical and developmental needs. He easily aspirates, so he is on a restricted diet and needs his liquids thickened. Without proper care, he is at high risk for developing pneumonia; "[w]ithin a matter of 24 hours [the situation] can be[come] very serious." Indeed, C.M. had been hospitalized six times since his birth. He also had bleeding in his brain around the time of his birth and consequently developed "low or weak muscle tone on the left side of his body which has impacted several areas of functioning." His speech functioning is "significantly delayed." Overall, he is developmentally delayed and has been diagnosed with cerebral palsy and celiac disease. Most recently, C.M. was diagnosed with disinhibited social engagement disorder, meaning he lacks wariness with strangers, which "puts him at high risk . . . to be victimized if he's not . . . highly supervised in public at all times."

¶22            To address these needs, C.M. requires continuous medical and developmental services. C.M. attends feeding therapy four days per week and regular breathing treatments, counseling, physical therapy, and occupational therapy appointments. He also sees a variety of doctors specializing in neurology, gastrointestinal medicine, pulmonology, orthopedic medicine, allergies, and ear, nose, and throat issues. Accordingly, C.M.'s therapist testified that his caregiver must be very efficient in coordinating and multitasking and "consistently attend . . . and actively participate in" C.M.'s services. Without a caregiver who consistently attends every appointment, C.M. could suffer "a significant risk to his physical health but also [to] his developmental capacities." Overall, the children's therapist testified that a caregiver who is "able to take in the new information that the doctors are providing and . . . able to implement that consistently is crucial for these kids."

¶23            After May 2017, DCS provided Mother with additional opportunities to demonstrate her ability to care for L.M. and C.M. DCS provided Mother with detailed instructions on the children's upcoming appointments and reiterated to her that she needed to attend every appointment and CFT. Mother received instruction on how to thicken C.M.'s liquids at his feeding therapies at Phoenix Children's Hospital. The children's therapist knew about each child's behavioral and medical issues and invited Mother to regularly meet with her and attend some of the children's therapy appointments. DCS allowed Mother to lead the CFT meetings, giving her an opportunity to display her knowledge about the children's needs and their upcoming appointments. Finally, for five months preceding the termination hearing, DCS provided Mother with a third parent aide who supervised four-hour visits twice a week in Mother's home. That parent aide educated herself on the children's special needs through the placement because Mother failed to provide her detailed information on C.M.'s medical issues.

¶24            Despite these additional opportunities, Mother still missed a number of the children's appointments after May 2017. For example, several of C.M.'s specialists held a joint meeting at which they detailed his restrictive diet; Mother did not appear, and the meeting had to be rescheduled. Moreover, Mother struggled with remembering instructions and adequately grasping the children's needs. She provided incomplete information while leading the CFT meetings and had trouble explaining the purpose and outcome of each medical appointment. Despite having received instructions on C.M.'s restricted diet, Mother attempted to feed him a strawberry, which could have caused him to aspirate.

¶25        Nor did Mother demonstrate awareness of L.M.'s emotional needs, including her need for extra protection due to her anxiety. At an encounter with both parents and placement, Mother pushed L.M. to engage with Father and failed to notice that L.M. was "not feeling safe," even though she was "physically . . . tensing up. Her eyes [were] getting bigger. She[ was] refusing to go." At the termination hearing, Mother could not explain why C.M. sees a pulmonologist or attends occupational therapy and she could not explain which doctor's appointments she had attended.

¶26        Mother also struggled with properly supervising the children during visits. The parent aide testified that Mother had difficulty retaining basic parenting directions and the parent aide often had to "intervene[] and remind[]" her. At one visit, L.M. ate part of a glow stick, and the parent aide had to call poison control and instruct Mother to wash out L.M.'s mouth. At other visits, L.M. tried to drink cleaning supplies, microwave her metal lunch box, and touch a hot stove. Each time, the parent aide had to redirect her. At a visit just before the termination hearing, Mother failed to redirect L.M. when she almost tipped over a recliner. Finally, the parent aide expressed concern that at times, Mother "sit[s] on the couch, and it seems like she is watching TV. But then when [the children] . . . walk up to her, she kind of is staring, looking forward, not moving, not reacting when the children are attempting to get her attention." Ultimately, the parent aide did not recommend unsupervised visits.

¶27        Considering this record, reasonable evidence supports the court's finding that DCS gave Mother the time and opportunity to learn about and demonstrate her knowledge of the children's special needs.

¶28        Because we affirm the juvenile court's ruling on the fifteen months' time in care ground, we decline to address the findings concerning the mental health ground. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002) ("If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds."). Mother does not appeal the juvenile court's best interests finding, and thus we do not address it. Ariz. R. Civ. App. P. 13(a)(7); Ariz. R. P. Juv. Ct. 106(a); *In re J.U.*, 241 Ariz. 156, 161, ¶ 18 (App. 2016).

## CONCLUSION

¶29     We affirm the superior court's order terminating Mother's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:   AA