NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MARIO G., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, E.G., *Appellees*.

No. 1 CA-JV 19-0016
FILED 8-15-2019

Appeal from the Superior Court in Maricopa County
No. JD14675
The Honorable Timothy J. Ryan, Judge

**AFFIRMED**

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee, Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Diane M. Johnsen joined.

---

**C A M P B E L L**, Judge:

¶1        Mario G. ("Father") appeals the superior court's order terminating his parental rights to his child, Evie. For the following reasons, we affirm.

## BACKGROUND

¶2        Father and April D. ("Mother") are the parents of Evie, born in March 2008.[1] Because of a juvenile delinquency adjudication involving sexual assault committed when Father was 14 years old, he must register as a sex offender. Mother has a history of abusing marijuana and methamphetamine, and just before Evie's birth, the superior court terminated Mother's parental rights to another child. The parents carried on a relationship while living in Colorado from 2004 to 2011. When Evie was about two years old, Father and Mother split up, and Mother moved to Arizona with Evie. Concerned about Mother's ability to parent, Father initiated custody proceedings in Colorado in 2010 and 2012 but allowed both to lapse.

¶3        In May 2012, DCS initiated dependency proceedings against both parents, alleging in part that Father neglected Evie by failing to maintain a normal parental relationship with her, failing to provide for Evie's basic needs, and failing to protect Evie from Mother's substance abuse. During the dependency, Colorado denied placement with Father because of his prior sexual offense and because he had outstanding charges for engaging in domestic violence with his fiancée. After the denial, Father quit participating in the case. Mother participated, however, and in 2013, the court returned the child to her custody and later dismissed the dependency. Over the next two years, Father had little contact with Evie and did not renew his pursuit for custody.

---

[1]        Mother is not a party to this appeal.

¶4            In March 2016, DCS filed a second dependency petition against both parents, alleging in part that Mother was once again abusing substances. The petition also alleged in part that Father had not provided for Evie's basic needs and had failed to maintain regular contact with the child. DCS continued to allege neither parent was able to provide proper and effective parental care. In April, the court again found Evie dependent as to Father. In 2016, Colorado again denied Father's request through the Interstate Compact on the Placement of Children ("ICPC") because he failed to complete the paperwork or complete a background check. During this time, Father participated in telephonic and video visits with the child. He also visited Evie in person at least once when he traveled to Arizona. The visits made the child uncomfortable and she often asked to end them early or not to attend at all.

¶5            In December 2016, the court changed the case plan to severance and adoption, and DCS moved to terminate Father's parental rights under the abandonment and nine-month out-of-home placement grounds. After Father moved to Arizona in May 2017, DCS provided Father services that included a psychological evaluation, individual and family counseling, a bonding and best-interests assessment, and parent aide services during visitation. In August 2018, DCS amended the motion to terminate Father's parental rights to allege only the 15-month out-of-home placement ground.

¶6            The superior court held a contested termination hearing over four days in November 2018. In January 2019, the court terminated Father's parental rights based on the statutory ground of 15 months in an out-of-home placement as alleged. Ariz. Rev. Stat. ("A.R.S.") § 8-533(8)(c). Father timely appealed.

**DISCUSSION**

¶7            To terminate a parent-child relationship, the superior court must find at least one statutory ground for severance under A.R.S. § 8-533(B) by clear and convincing evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). The court must also find severance is in the child's best interests by a preponderance of the evidence. *Id.* We review the court's severance determination for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). The superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of the witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004).

## I.     Fifteen-Month Out-of-Home Placement Ground

**¶8**          The superior court may terminate parental rights under the 15-month out-of-home placement ground if it finds that (1) "the child has been in an out-of-home placement for a cumulative total period of fifteen months or longer"; (2) "the parent has been unable to remedy the circumstances" which caused the out-of-home placement; and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). Circumstances means "those circumstances existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 96 n.14 (App. 2009) (internal quotation omitted). The superior court must also find that DCS made diligent efforts to provide appropriate reunification services. A.R.S. § 8-533(B)(8).

**¶9**          Father first argues that the court improperly based its termination order solely on his failure to accept that Evie did not want to live with him or on his unwillingness to consent to severance.[2] As support, Father cites *Desiree S. v. Department of Child Safety*, in which this court found that an eleven-year-old boy's subjective belief that his mother could not keep him safe, coupled with his refusal to participate in family counseling, could not by themselves support termination under § 8-533(B)(8)(c). 235 Ariz. 532, 534-35, ¶ 11 (App. 2014). *Desiree S.* is distinguishable. Here, Father participated in multiple services, including family counseling. Although the child remained resistant to developing a relationship with Father throughout the dependency, the court did not base its decision on the wishes of the child, but rather on Father's inability to meet her emotional needs and establish a bonded parent-child relationship. Specifically, the court found that Father's absence from the child's life for six years adversely impacted the child and Father refused to acknowledge that he had ever been absent from her life or how his absence negatively affected her. The court found Father "dishonestly maintains that he has 'always' been actively involved in [the child's] life." Based on Father's testimony, the court concluded:

> [H]e is and will remain unable to develop an honest sense of self-awareness. [He] abandoned his daughter. When given a chance to admit his failings and seek reconciliation and

---

[2]          Father does not challenge the court's findings that the child was in an out-of-home placement for over 15 months or that DCS made a diligent effort to provide him with appropriate reunification services.

healing, he instead lied to his daughter, lied to the counselors and therapists, and lied to this [c]ourt. [Father's] stated belief that he has been a positive, active presence in his daughter's life demonstrates that he will never remedy the problems caused by [his] six-year absence.

As the court emphasized, it is Father's actions and his complete inability to appreciate his own actions that prevented development of a parent-child relationship. The court focused on Father's failure to appreciate, much less meet, Evie's emotional needs rather than on the child's wishes or Father's unwillingness to consent to termination.

**¶10** Father next argues that insufficient evidence supports the court's findings because he complied with the case plan and "did everything possible in his power . . . to establish a better relationship with [Evie], to understand [her] need[s] and concerns and improve his parenting capacity." Under the 15-month ground, however, the focus is not on whether a parent participates in the case plan, but on whether he is ultimately able to remedy the circumstances causing the child's out-of-home placement. *Compare* A.R.S. § 8-533(B)(8)(a) *with* 8-533(B)(8)(c). Here, reasonable evidence supports the court's finding that Father was unable to do so.

**¶11** The court found that Father had been absent from the child's life for six years. Indeed, Mother and child moved to Arizona around 2011, and although Father was concerned about Mother's substance-abuse issues, he never followed through with custody proceedings or otherwise tried to protect the child. Although Father testified that he maintained regular contact with Evie after the parents split up, he admitted that his contact "wither[ed] away" once she moved to Arizona. Even though Father was unable to provide photos of any contact between 2013 and 2016, he continued to maintain the fiction that he had been involved in her life. Conversely, Evie disclosed during the bonding assessment with a psychologist that Father had not been a part of her life and had abandoned her. This is further illustrated by Father's failure to participate in the first dependency after Colorado denied his ICPC and his failure to pursue parenting time or custody of her after the court dismissed that dependency. Given the conflicting evidence, the superior court was free to reject Father's assertion that he had maintained regular contact with Evie after she and Mother moved to Arizona. *Oscar O.*, 209 Ariz. at 334, ¶ 4.

**¶12** Because Father had not parented this child for six years, at the outset of this dependency, DCS made clear to him the behavioral changes

he needed to make, including "gain[ing] insight into his interactions and how they [a]ffected" Evie and "understand[ing] her emotional needs." Additionally, DCS wanted Father to "[t]ake responsibility for his absence in [her] life," "[r]espect [her] boundaries [regarding] physical and verbal affection," and "better appreciate experiences from [her] point of view." DCS case managers communicated these goals to him throughout the case.

¶13　　　　Before he moved to Arizona, Father struggled to make any meaningful connection with his daughter. After he moved to Arizona and after the case plan had changed to severance and adoption, he continued to struggle to bond with his child. At Father's first few meetings with DCS after he moved, he became "explosive and hostile," insisting that he had always been a part of his child's life and demanding that DCS return her to his custody. According to a DCS caseworker, Father "refuse[d] to allow [Evie's planning team] to focus on [her] behavioral health need[s]" and "was not receptive to feedback regarding Evie's concerns, behaviors, [and] . . . need for . . . therapy." Similarly, the child's therapist allowed Father to attend some of her counseling sessions but reported that he was "explosive and uncooperative with the process" and "unreceptive to feedback." Likewise, the case supervisor testified that in her conversations with Father, "he has been . . . argumentative, blameful, [and] feels that [the child] is being brainwashed by" DCS and that "people are against him, rather than trying to help."

¶14　　　　After moving to Arizona, Father continued to deny any wrongdoing and could not understand or meet the child's emotional, physical or financial needs over the next 16 months. The case supervisor told Father that he needed to consider his daughter's point of view and that "there were significant gaps in time" when Father was not in her life, but "instead of [F]ather being able to accept that," he insisted, "yes she does know me." The child herself expressed to Father that "she doesn't know why he came back into her life, and that she doesn't believe that he has been in her life." DCS and the family therapist suggested that Father give "a narrative for what has happened during her life," meaning he "need[ed] to explain to her [in] what ways he has been in her life and . . . why she is [in] foster care instead of in his care." Rather than take that advice, Father continued trying to tell Evie that he had been a good father to her. For example, at a visit in January 2018, Father brought photos of Evie as a baby and, one by one, held them a few inches away from her face. He continued even though the child "lean[ed] away," or "turn[ed] her face," "anything to avoid looking at the picture." Without acknowledging his daughter's reaction, Father insisted he "ha[d] always been there." In response, she

grabbed a picture and threw it in the trash. At the termination hearing, Father denied any negative reaction to his showing her photos.

¶15 Further, Father failed to recognize and respect his daughter's boundaries. He repeatedly showed her physical affection, though she pushed him away because it made her uncomfortable. Father persisted, even when the case aides, the parent aide, and the family therapist asked him to curtail his physical contact with Evie. Likewise, Father would take pictures of Evie, though he knew it made her uncomfortable.

¶16 The psychologist who performed the bonding assessment reported that the conversation between Father and daughter "took on an adversarial tone pretty quickly." For example, Father insisted that Evie knew an individual from his past. When the child disagreed with him, he became angry and called her a liar. At another visit in January 2018, against Evie's wishes, Father celebrated Mother's birthday, continually prompting her to acknowledge the birthday, though she did not want to. Talking about Mother had a significant negative effect on the child and at a family therapy session in September 2018, she asked Father not to discuss her mother anymore. Father disregarded the request and explained he would talk about her nonetheless because she will always be her mother. Father's statement caused the child to cry, and afterwards, she became "more avoidant and resistant in" family therapy sessions. Father's lack of insight was also reflected in his plan to take his daughter back to Colorado if given custody. Although DCS and the psychologist explained that such a big change could be traumatic for her, Father responded that if DCS would just allow her to go back, "she would be fine." As a final concern, Father never registered as a sex offender in Arizona, opening himself up to a possible arrest warrant.

¶17 Ultimately, the psychologist, the family therapist, the case supervisor, and the case manager all concluded that Father was unable to meet Evie's emotional needs. The psychologist found there was no parent-child bond between the two and that the biggest obstacle to reunification is Father's lack of empathy for his child. The case supervisor also concluded that the barrier to development of a parental bond was due to Father "not being able to hear what his child was saying and what her emotions were regarding the gaps in time of his parenting." The case manager testified that Father "continues to be resistant to any type of feedback regarding interacting with" Evie; "express[es] his affection in [ways] that make her uncomfortable and [does not] respect[] her boundaries"; and "continues to struggle to meet her emotional needs." The family therapist likewise testified that the main barrier to reunification is that Father resists and

dismisses Evie's emotional responses to his behavior. Considering this evidence, the superior court could have reasonably found that Father was unable to remedy the circumstances causing the child's out-of-home placement.

¶18 Reasonable evidence also supports the court's finding that there is a substantial likelihood that Father will not be capable of exercising proper and effective parental care and control of his daughter in the near future. Based on his assessment, the psychologist testified it is "highly unlikely" that Father and daughter could develop a bond in the near future. He concluded that reunification efforts had reached a "point of significantly diminishing returns" and that "other interventions will have little impact" and may even "worsen the situation." He determined that continuing visits could result in emotional harm to Evie. The case manager agreed, testifying that Evie had been in foster care for over two years, and despite reunification services, was not "at a place [with Father] where she [felt] safe and comforted and nurtured," mainly because Father was unwilling or unable to understand or meet her needs.

## CONCLUSION

¶19 We affirm the order terminating Father's parental rights to Evie.

