NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SHELBY B., TONY T., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.T., G.T., *Appellees.*

No. 1 CA-JV 19-0015
FILED 12-19-2019

Appeal from the Superior Court in Maricopa County
No. JD 34422
The Honorable Michael D. Gordon, Judge

**AFFIRMED**

COUNSEL

Denise L. Carroll Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellant, Mother, Shelby B.*

David W. Bell, Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant, Father, Tony T.*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee, Department of Child Safety*

## MEMORANDUM DECISION

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Judge Michael J. Brown joined.

C A M P B E L L, Judge:

**¶1**          Shelby B. ("Mother") and Tony T. ("Father") (together, "Parents") appeal the superior court's order granting permanent guardianship of their two sons to the children's paternal aunt and uncle, Debbie and Jonathan Marker. Under A.R.S. § 8-871(A)(3), a court may establish a permanent guardianship when the Department of Child Safety ("DCS") "has made reasonable efforts to reunite the parent and child and further efforts would be unproductive." Parents argue that the superior court erred in granting permanent guardianship because DCS failed to meet its burden of proof regarding these statutory requirements. We disagree and affirm.

## BACKGROUND

**¶2**          Parents are the biological parents of A.T., born in 2002; and G. T., born in 2006 ("Children").[1] In November 2016, the older child ran away from home and began living with his aunt and uncle, the Markers. In June 2017, Rebeca Moskowitz, the guardian ad litem ("GAL") for the older child, filed a private dependency petition, requesting that the child be made a temporary ward of the court in the care, custody, and control of DCS and remain placed with the Markers. The petition alleged incidents of domestic violence between the Parents as well as acts against A.T. The GAL also alleged the Parents suffered from housing instability, failed to provide adequate supervision because of both Parents' habitual overconsumption of alcohol, and that Mother had mental health issues.

---

[1] Initially, paternity had not been established regarding the older child. In addition to Father, the court also recognized John Doe as an alleged father of the older boy. Father's paternity of the older child was not established until September 2018. At the guardianship hearing, the court entered judgment *sua sponte* establishing that Father was in fact the older boy's father.

**¶3**        The court entered temporary orders, joining DCS as a party, appointing counsel for the older child and Parents, and placing the child in the temporary "care, custody, and control" of DCS. The court found that "continuation of the child[] in the home would be contrary to the welfare of the child" because the Parents were unwilling or unable to parent the child due to substance abuse and domestic violence. With permission of the court, DCS later amended the petition to include the younger child.

**¶4**        Initially, Parents "refuse[d] to disclose their whereabouts and current location of [the younger child]." After being unable to locate the younger child, DCS filed a motion for pickup of minor child. The court authorized law enforcement to assist in locating the younger child and to transfer custody from Parents to DCS, over Father's objection. In his written objection to the motion, Father admitted that the younger child had been living with him all along.

**¶5**        Parents denied the allegations in the dependency petition at the initial dependency hearing. The court held a contested dependency hearing in November 2017, at which time both Parents entered no contest pleas to the allegations in the petition. The court found both Children dependent and established a case plan for family reunification.

**¶6**        The older child remained in his placement with the Markers, and, initially, DCS "met with [Parents] to develop a safety plan for the return of the [younger] child[] to the Father only." This placement was conditioned on Mother leaving the home and Father supervising all visitation with Mother. DCS changed its recommendation after the younger child expressed concern about Father's inability to protect him from Mother and requested to remain with his paternal aunt. In light of the child's concerns, the younger child was also placed with his aunt, Debbie Marker — one of the two permanent guardians in this case.

**¶7**        Under the case plan, Parents were required to engage in various services. Mother was referred for urinalysis testing, substance abuse assessment and treatment, bonding assessment, individual counseling, therapeutic visitation, a psychological evaluation, individual counseling, and transportation. Father was referred for urinalysis testing, bonding assessment, paternity testing, individual counseling therapeutic visitation, psychological evaluation, and transportation. Both Parents were also permitted to engage in supervised visitation, but the referral was closed in November 2017 because the Children refused to participate in visits with either parent. The agency tasked with providing therapeutic visitation refused to begin services because of the lack of Parents' progress

in individual counseling. Father was referred for paternity tests eight times between September 2017 and August 2018. In August 2018, Father finally provided a DNA sample and the lab determined that Father was the older child's biological father.

¶8            In July 2018, DCS recommended changing the case plan from family reunification to permanent guardianship. At that point, the older child had been out of the home since November 2016—before the dependency had been filed—and had "not had any significant contact with [either] Mother [or] Father." Similarly, the younger child had been out of the home since August 2017 and had not had any significant contact with Parents. Both Children had been in their placement with the Markers, who were "willing to be a permanent placement, if necessary."

¶9            The superior court held a hearing on the Motion for Appointment of a Permanent Guardianship in December 2018. Parents failed to appear for the hearing, and the court noted that, "[M]other and [F]ather were properly served, had notice of [the] proceedings, and provided no good cause for their failure to attend them. They [were] deemed to have waived their right to appear and [were] deemed to have admitted the allegations of the Motion for Appointment of Permanent Guardianship." The court proceeded in their absence, allowing cross-examination and objections by the Parents' attorneys.

¶10           The caseworker testified about the services offered by DCS. For example, the results of Mother's first urinalysis test showed that the sample was diluted, causing DCS to require additional testing. Mother stopped testing from October 2017 through December 2017 when services were closed out. The caseworker attempted to reengage Mother in August 2018 with another referral, but Mother did not participate.

¶11           The caseworker testified that Parents failed to attend two separate appointments for bonding assessments. She testified that Parents participated in individual counseling, but the provider reported both Parents failed to engage during counseling, resulting in the referral being closed due to a lack of participation. Later, DCS again referred Parents for counseling, but neither Parent participated in the offered service. Because Parents were resistant during or completely absent from individual counseling, the provider refused to facilitate therapeutic visitation with the Children.

¶12           Following the hearing, the court entered findings that DCS had "made reasonable efforts to reunify the family and that further efforts

would be unproductive." The court based this finding on the Parents' "categorical refusal" to engage in services. At the end of the hearing, the court appointed the Markers permanent guardians of the Children. Parents timely appealed.

## DISCUSSION

¶13     We review an order establishing a guardianship for clear error and will affirm unless no reasonable evidence supports the superior court's findings. *Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555 (App. 1997). The superior court, as the trier of fact, "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (internal quotation omitted).

¶14     Parents argue DCS failed to meet its burden to show it made reasonable efforts at reunification. DCS satisfies its obligation to make reasonable efforts to reunify the family when it provides a parent "with the time and opportunity to participate in programs designed to help [Parents] become an effective parent." *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). It is not DCS' duty to force parents to participate in the services they offer. *Id.*

¶15     Mother initially participated in drug and alcohol testing, but she was inconsistent.  In September 2017, she provided only two negative samples and one diluted sample; and then by October 2017, Mother had quit participating in drug and alcohol testing altogether. Mother completed a psychological evaluation but beyond this, Mother did not engage in other recommended services.

¶16     Similarly, Father failed to participate in services. As noted above, Father was offered multiple services including urinalysis testing. Father participated in one test that was negative. DCS referred Father for a hair follicle test, but the caseworker could find no records that he participated. DCS referred father for a psychological evaluation that he never completed. Father finally participated in a paternity test after his eighth referral and only after DCS changed the case plan from family reunification to permanent guardianship. The two services—one drug test and the paternity test – were the only services Father engaged in over the course of the dependency despite access to multiple services made available to him by DCS. Father attended individual counseling in September 2017 but did not engage. Father's counselor felt that Father was not making any progress, and eventually this service was closed. Father was again referred

for counseling in September 2018, but never participated, even after DCS repeatedly rescheduled his appointments. DCS is not responsible for Parents' failure to participate in offered services. Accordingly, reasonable evidence in the record supports the superior court's finding that DCS made reasonable efforts to reunify the family.

**¶17**      Parents also allege DCS failed to show that "further [reunification] efforts would be unproductive." A.R.S. § 8-871(A)(3). The superior court found that further reunification efforts would be unproductive because of "Parents' categorical refusal to engage in service[s] over the last four months, including the [Bonding and Best Interest] and alienation assessment, which would have provided more information regarding whether the therapeutic intervention ordered would be appropriate." Accordingly, reasonable evidence supports the superior court's finding that further efforts to reunify the family would be unproductive in light of parents "categorical refusal" to engage in the majority of services offered.

**¶18**      There is ample evidence in the record to support the court's findings that DCS made reasonable efforts to reunify the family and that further efforts would be unproductive.

## CONCLUSION

**¶19**      For the foregoing reasons, we affirm.

