NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

FELISHA S., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, R.S., N.S., A.S., *Appellees*.

No. 1 CA-JV 20-0374
FILED 5-27-2021

Appeal from the Superior Court in Maricopa County
No.  JD 22881
The Honorable Robert I. Brooks, Judge

**AFFIRMED**

COUNSEL

Czop Law Firm PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1        Felisha S. ("Mother") appeals the juvenile court's order terminating her parental rights to her children. Mother argues that the court erred by finding she had been unable to remedy the circumstances causing her children to be removed from her care and that she would be unable to appropriately parent in the near future. Because the record supports the court's findings, we affirm.

**BACKGROUND**

¶2        Mother and Johnny S. ("Father") have four children, Arthur born in 2012, Rob born in 2013, Molly born in 2015, and Amber born in 2016.[1] In 2012, Mother tested positive for marijuana while she was pregnant with Arthur. The Department of Child Safety ("DCS") responded and, after making contact, became concerned not only about Mother's drug use, but also that Father may have sexually abused Mother by initiating a sexual relationship while Mother was still a minor, and that the pregnancy occurred prior to Mother's 18th birthday. Father was also married to Mother's biological mother. Once Arthur was born, DCS removed him from the parents' home and placed him with Mother's adoptive mother ("Grandmother"). Although Mother's parental rights to Arthur do not appear to have been severed, Arthur is currently in Grandmother's care.

¶3        After Rob, Molly, and Amber were born, DCS received reports that Mother and Father were using drugs, leaving the children unsupervised, and abusing the children. Molly had been hospitalized on two separate occasions, first after being bitten on the face by a dog, and second after ingesting Father's morphine pills that had spilled on the floor.

---

[1] We use pseudonyms for the children throughout to protect their privacy and identity. Father and Arthur are not parties to this appeal.

On another occasion, Rob was left outside unsupervised and climbed onto the roof of Father's condo.

¶4            Around 2017, Mother and Father separated. In May 2018, after spending time with Father, Molly returned with a circular cut on her face. Molly reportedly told Grandmother that Father had thrown a cup at her. Father asserted that the injury occurred while vacuuming, claiming that the vacuum hose accidentally became attached to Molly's face while operating and created the injury through suction.

¶5            A few days later, police responded to a report that Father was abusing Rob, Molly, and Amber and using drugs in their presence. Upon arrival, the complainant informed police that Father and the children were living out of a shed and vehicle in the backyard of her residence and had no food or running water. The officers observed that the children were wearing "extremely dirty clothes," discovered a bucket of feces, and noticed what appeared to be sleeping mats and the children's belongings in the shed. Father told police that he and the children were staying in the house, but the complainant stated they were not. While exiting the complainant's residence, the officers noted that the place was very dirty, with trash everywhere, and had bed bugs according to the complainant. Father was arrested on suspected child neglect and DCS took the children into care. At the time there were also concerns about Mother, as Father had told police Mother was homeless and using drugs. DCS confirmed this information by contacting Mother, who told DCS she was looking for housing for herself and the children. She claimed to be unaware that the children were at risk of neglect and abuse while staying with Father.

¶6            The children were placed with Grandmother, and DCS filed a dependency petition concerning all three children. In September 2018, the children were adjudicated dependent, and the court set a case plan for family reunification. DCS began offering the Parents reunification services. At some point, Mother moved in with her boyfriend. However, DCS doubted this would be a suitable placement for the children, suspecting Mother was lying about how many people were living in the apartment.

¶7            Father received numerous referrals to substance-abuse testing, substance-abuse counseling, a psychological evaluation, parent-aide services, supervised visits, and transportation. However, he missed many scheduled drug tests, and tested positive for, among other things, methamphetamine, cocaine, and heroin when he did test. Father also exhibited alarming behavior during supervised visitations with his children, including referring to Molly as a "sexy little girl," and using

abusive language towards the parent aide. After one visit in which Father had to be redirected, Father sent a picture of a gun to the parent aide with message saying that he "couldn't take it anymore," and suggested he might commit suicide.

¶8            Mother was also offered a variety of services, including substance-abuse testing, substance-abuse counseling, a psychological evaluation, individual counseling, parent-aide services, visitation, and transportation to and from service appointments. Mother repeatedly tested positive for marijuana, but eventually obtained a medical marijuana card in January 2019. During the prior dependency with Arthur, Mother was offered drug counseling. As part of this dependency, Mother was terminated twice from the drug counseling program, but was able to complete services after a third attempt. There is dispute over whether Mother participated in after care or a maintenance plan. Mother failed to complete a parent-aide program, having been terminated twice for lack of engagement and inability to improve some parenting capacities.

¶9            Mother was referred for a psychological evaluation but did not show up for the first three appointments. On the fourth attempt, Mother completed the psychological evaluation with Dr. Kelly Rodriguez. Dr. Rodriguez found that Mother lacked insight into "the impact of her behaviors," and struggled with identifying or acknowledging safety threats to the children. Dr. Rodriguez recommended individual counseling to address these issues. However, Mother did not complete this treatment.

¶10           In July 2020, DCS petitioned to sever Mother and Father's parental rights to Rob, Molly and Amber. During trial, the State presented evidence of Father's drug use and the problematic behaviors exhibited during visitation. Nonetheless, Mother testified that she did not think Father posed a risk to the children and would not see a problem with letting him have access to the children. Mother testified that she was currently using marijuana one or two times a day. She also testified that she was working at Subway and was still living with her boyfriend. She claimed that she and her boyfriend lived there alone, and disputed DCS's suspicion that there were random people staying in her apartment. The DCS case manager testified to Mother's lack of engagement and communication, although Mother blamed the poor communication on DCS.

¶11           Following trial, the superior court severed Mother's parental rights on the ground of fifteen months' out-of-home placement pursuant to A.R.S. § 8-533(B)(8)(c). Mother timely appealed.

## DISCUSSION

**¶12**    We view the evidence and reasonable inferences therefrom in the light most favorable to sustaining the superior court's termination order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). As the trier of fact, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004). This court will not, therefore, reweigh the evidence. *Jordan C.*, 223 Ariz. at 93, ¶ 18. We will affirm a termination order supported by reasonable evidence. *Id.*

**¶13**    "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005). But even fundamental rights are not absolute. *Id.* To terminate a parent's parental rights the superior court must find at least one statutory ground under A.R.S. § 8-533 by clear and convincing evidence, A.R.S. § 8-537(B), and by a preponderance of evidence that termination is in the child's best interests. *Kent K.*, 210 Ariz. at 288, ¶ 41.

**¶14**    When proceeding under A.R.S. § 8-533(B)(8)(c), the superior court may terminate a parent's rights if it finds that: (1) "[t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer"; (2) "the parent has been unable to remedy the circumstances" that caused the out-of-home placement; and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." Additionally, DCS is required to prove that it made diligent efforts to provide the parent appropriate reunification services. A.R.S. § 8-533(B)(8). In making that determination, the court must consider the availability of the reunification services offered and the parent's participation in services. A.R.S. § 8-533(D).

**¶15**    On appeal, Mother challenges the superior court's findings that she has been unable to remedy the circumstances leading to out-of-home placement, and that she would be unable to parent in the near future, arguing the record does not support the court's conclusions.[2]

---

[2] Mother does not challenge the findings that the children have been in care for fifteen months, that DCS diligently provided reunification efforts, or that severance was in the children's best interest.

## I.     Marijuana Use

¶16          The court found that Mother's "ongoing dependence on marijuana every day continues to prevent the children from returning to her care." The court noted Mother's troubled history with the illegal use of marijuana, and inferred that her misuse was a contributing factor to the past incidences of abuse and neglect.

¶17          Mother argues that the superior court erred in taking her daily marijuana use into consideration. First, Mother asserts that her use of medical marijuana is protected by the Arizona Medial Marijuana Act (AMMA), which states:

> No person may be denied custody of or visitation or parenting time with a minor, and there is no presumption of neglect or child endangerment for conduct allowed under this chapter, unless the person's behavior creates an *unreasonable danger* to the safety of the minor as established by clear and convincing evidence.

A.R.S. § 36-2813(D) (emphasis added). Mother eventually obtained a valid medical marijuana card, and asserts she was using marijuana to help with pain in compliance with the AMMA. Mother further contends that the record does not show her use created an "unreasonable danger," as mentioned in § 36-2813(D).

¶18          However, the court did not sever Mother's parental rights based solely on her marijuana use. In fact, the court went so far as to recognize that Mother was not required to eliminate use of marijuana to be a fit parent. Instead the court merely considered Mother's current, daily marijuana use as one factor, in combination with her inability to protect the children and recognize safety concerns, engage in appropriate services, and provide a safe environment for her children to live. All of which culminated in preventing the children from being returned to her care.

¶19          Mother also contends that the record contains no evidence showing Mother's use of medical marijuana affected her ability to parent. She notes that DCS was concerned about "where [Mother] kept her medical marijuana, if she would use it around the children, or if she used too much." However, she argues that there is no evidence that supports any of these concerns. In fact she contends there is evidence to the contrary, pointing out that she was educated on substance abuse through Terros, and citing her own testimony that she did not believe a person under the influence of drugs should be watching children.

¶20 However, Mother's marijuana use was a concern from the beginning of DCS's involvement. Mother tested positive for marijuana during her first pregnancy, and her marijuana use was the reason her oldest child was removed from her care in 2012. She admitted to using marijuana prior to obtaining a medical marijuana card and her illegal use of the substance occurred from 2012 until she obtained her medical marijuana card in 2019. Based on lack of drug testing and some positive tests, it can be inferred that Mother continued to use marijuana illegally for six months after the second dependency was filed. She was inconsistent in drug testing throughout the dependency. Although mother was able to complete drug counseling, this was only after three attempts during which her use of marijuana continued. Given Mother's history of marijuana abuse, her difficulty adhering to drug counseling and testing, and her current daily use, it was reasonable for the superior court to infer Mother was exceeding her therapeutic dosage.

¶21 Additionally, the incident where her daughter ingested morphine pills that had been spilled on the floor, suggested Mother lacked the ability to properly supervise and store drugs in a manner that did not present a safety concern for the children.

¶22 Given Mother's history of illegal marijuana use and the inappropriate storage of drugs in her residence, it was permissible for the court to consider Mother's continuing daily use a factor preventing reunification.

## II. Mother's Ability to Protect Children from Father

¶23 As mentioned, the court also found that Mother's inability to recognize the danger Father posed to the children to be a factor keeping the children out of her care. The court explained that while it was apparent Father was actively using drugs, Mother still believed Father was a safe and capable parent. The court also found that "Mother's inability to recognize Father's inappropriateness, and her minimization of his violent tendencies, places the children at risk of harm in her care."

¶24 Mother argues these concerns are too speculative to support the court's finding that she had been unable to remedy the circumstances leading to out-of-home placement. To support her argument, Mother points to her own trial testimony asserting she did not know Father had abused or neglected the children when the case began, or that he used illegal drugs. She argues that she fully acknowledged that the condition the children were in when removed from Father was concerning, and that she promised to

protect the children if Father were to abuse drugs, or otherwise prove himself a danger.

¶25        However, Mother also testified at trial that Father was a good parent, and that she did not believe Father had a drug problem. Further, after hearing testimony from the DCS case manager regarding Father's drug use and inappropriate behaviors during visitation, Mother testified that she did not believe Father posed a safety risk to the children and would not see a problem with letting him see the children. Despite her testimony that she would protect her children *if* she discovered Father proved dangerous, her inability to recognize the current danger Father presents to the children continues to hinder her ability to protect them. The court went on to find that, due to her inability to recognize the harm Father poses to the children, Mother would be unable to successfully parent in the near future.

¶26        The court also cited Mother's failure to complete parent aide classes and Dr. Rodriguez's guarded prognosis as additional reasons supporting its conclusion, and noted that Mother refused the counseling services Dr. Rodriguez had recommended. Mother admits that she did not complete parent aide classes and that the psychologist gave a guarded prognosis. She argues, however, this evidence does not specifically demonstrate she was unable to protect the children from Father. Mother also explains that she did not want to participate in further counseling because she had already completed drug counseling. On appeal, she argues that she was validly confused about what counseling services she was required to complete.

¶27        We are not persuaded. Dr. Rodriguez specifically recommended counseling to help Mother safely parent her children. Even if Mother was confused about what services were required, such confusion was likely the result of Mother's lack of cooperation and communication.

¶28        On this record, reasonable evidence supports the superior court's conclusion that Mother lacked the ability to protect her children from Father, that this was a barrier to reunification, and would be a persistent problem rendering Mother unable to appropriately parent in the foreseeable future.

## CONCLUSION

¶29  Reasonable evidence supports the juvenile court's findings that Mother has not remedied the circumstances causing her children to be taken from her care and would be unable to appropriately parent in the near future. We affirm the termination of the parental relationship.



AMY M. WOOD • Clerk of the Court
FILED: AA

9