NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

CLINT H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, X.H., X.H., *Appellees*.

No. 1 CA-JV 20-0352
FILED 8-31-2021

Appeal from the Superior Court in Maricopa County
No.   JD 39247
JS  20498
The Honorable Christopher T. Whitten, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, Scottsdale
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Brian Y. Furuya joined.

---

**B R O W N**, Judge:

¶1 Clint H. ("Father") appeals the juvenile court's order terminating his parental rights to his sons, L.H., born in 2018, and I.H.,[1] born in 2019. Because reasonable evidence supports the order, we affirm.

## BACKGROUND

¶2 Father and Illana J. ("Mother") are the biological parents of I.H. and L.H. Mother is not a party to this appeal. The Department of Child Services ("DCS") first became involved in March 2020, when Father and Mother (collectively "Parents") brought I.H. to Phoenix Children's Hospital due to a swollen head and seizures.

¶3 While at the hospital, Mother disclosed that I.H. had a history of breathing problems. She and Father identified five instances in early 2020 when the child had difficulty breathing, including the March incident. Mother reported she thought the child had died during one of those episodes. During the March incident, I.H. turned blue and Mother called Father at work to tell him what happened. Father drove home and took Mother and I.H. to the hospital. Due to the hospital's COVID-19 procedures, only one parent was allowed in the building with I.H., so Father waited outside. A doctor and a nurse practitioner determined I.H. had many injuries, including: a large skull fracture, evidence of two separate brain bleeds, a history of potential seizures (the breathing episodes), evidence that his arm had been previously broken in two places, ear bruising, and a torn upper frenulum.

¶4 The "frenulum" is a piece of connective tissue that extends from the inside surface of the upper lip to the upper portion of the gum on the top part of the jaw. A doctor who treated I.H. explained that a torn

---

[1] Because the children's first names begin with the same letter, we distinguish them by their middle initials.

frenulum is highly suggestive of abuse because it does not tear without severe force.

¶5 I.H. was also severely malnourished and dropped from the 70th percentile for weight to less than the first percentile for weight, gaining only a third of a pound in 19 weeks. Medical staff described the child as so thin that he had loose skin around his body, protruding bones, and a visibly swollen head. A nurse practitioner also noted I.H. had injuries usually present with traumatic brain injuries and common with abuse including, thrombosed bridging veins, cervical ligament swelling, and a nasal hematoma. Hospital staff contacted the police, and an officer arrived after Mother left. Police then went to Parents' home to execute a search warrant. Mother claimed I.H.'s injuries resulted from falling off a bed a few days earlier.

¶6 I.H. had been born four months premature and spent the first "two to three months" of his life at the hospital. After he was released, Parents soon stopped taking I.H. to his appointments because they felt the hospital staff did not respect their decisions regarding the child. A nurse practitioner reported that I.H. was given pear juice, water, and baby food starting at seven months of age (adjusted age of three months) instead of formula. Once I.H. received formula, he began gaining weight.

¶7 In connection with the March incident, medical staff also evaluated L.H. and discovered his growth rate had slowed significantly. In just five months, L.H. dropped from the 95-97th to the 75-80th percentile in weight and gained only one pound five ounces, which is considered extremely slow for a 19-month-old child.

¶8 After DCS took custody of both children, I.H. was released from the hospital and DCS filed a dependency petition. About a month later, DCS petitioned for termination, alleging Father either willfully abused and neglected the children or failed to protect them from abuse and neglect. The court held a consolidated dependency/termination hearing over the course of three days, hearing testimony from numerous witnesses, including a detective, hospital social worker, DCS contracted case worker, doctor, nurse practitioner, hospital dietician, and the Parents. The juvenile court granted the dependency petition and the termination petition, finding "clear and convincing evidence that [I.H.] was abused and neglected by his parents, or that they were aware of the abuse and neglect and failed to protect him." The court also found clear and convincing evidence that L.H. would be at risk of future harm. Father timely appealed and we have jurisdiction under A.R.S. § 8-235(A).

**DISCUSSION**

**¶9**        To terminate parental rights, a court must find (1) by clear and convincing evidence that at least one statutory ground in A.R.S. § 8–533 has been proven, and (2) by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286, ¶ 15 (App. 2016). We will affirm an order terminating parental rights so long as reasonable evidence supports the order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

**¶10**       When seeking termination based on abuse or neglect, DCS must prove a parent "has neglected or wilfully abused a child. This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child." A.R.S. § 8–533(B)(2).

**¶11**       Father argues I.H.'s injuries were not the result of any intentional or willful abuse; at most, there were issues with the care of a complicated child that could have been easily resolved through additional training. Father is essentially asking us to reweigh the evidence, which we will not do. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018) (citations omitted) ("The resolution of conflicting evidence is 'uniquely the province of the juvenile court' . . . even when 'sharply disputed' facts exist."). According to medical staff who examined I.H., he was so thin that "you could see his bones," he had loose skin, he was cachectic (muscle wasting), and his head was visibly swollen. The doctor and nurse practitioner both testified that I.H.'s prematurity would not explain any of the injuries. The juvenile court found that Parents had either abused and neglected I.H., or they were aware of the abuse and neglect but refused to protect him. The evidence supports this finding, and the court did not err in determining that the injuries were not attributable to I.H.'s premature birth.

**¶12**       Father also contends DCS failed to prove neglect or abuse because he was not the primary caretaker and was away from the home at work during most of the breathing episodes and when I.H. fell off the bed. Father suggests he could not have reasonably been expected to know I.H. needed medical care.

4

¶13 Both children, however, were in the sole care of Mother and Father. DCS did not need to prove which parent abused the child; instead, it could show that either Father abused the child, or he knew or should have known that Mother did. *See generally Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224 (2020) (affirming termination without deciding which parent caused the abuse). As the juvenile court explained, it may have been possible for any of these injuries to occur and for Father not to have caused them or not have known they were cause for concern. But the chance of all these things happening and Father not causing them or knowing about them is "miniscule to nil." And while Father may have been at work during most of the breathing episodes, he was told about them and was home during one of them. Further, the treating doctor testified I.H.'s swollen head was apparent to a lay person. The treating nurse practitioner also testified that a reasonable person would have sought medical attention for I.H. based solely on his general appearance due to malnourishment. Father was not excused from his parental responsibilities simply because Mother was the primary caretaker. Thus, the court did not err in terminating Father's parental rights to I.H. on grounds of abuse and neglect.

¶14 Citing *Sandra R.*, Father argues DCS failed to prove any ground of severance as to L.H. because there were no signs L.H. was abused or neglected. "[T]o terminate parental rights to children who exhibit no evidence of neglect or abuse, under § 8-533(B)(2), the juvenile court must find during the parental unfitness inquiry, by clear and convincing evidence, that there is a risk of harm to those children." *Sandra R.*, 248 Ariz. at 228, ¶ 17. The court found that "at a minimum" Father failed "to recognize the existence or importance of severe injuries and malnourishment of" I.H. The court also determined "[t]he evidence is clear and convincing that Father lacks the sort of protective capacity that is necessary to keep [L.H.] safe." The record supports these findings. Given Father's inability or unwillingness to protect I.H. from abuse and neglect, and recognizing the severity of his injuries, the court did not err in finding there was a risk of harm to L.H.

¶15 Lastly, Father summarily argues DCS failed to provide him with services that would address any issues he had and enable him to reunite with L.H. Because Father did not object in the juvenile court to the adequacy of the services he was provided, he has waived the right to challenge on appeal the juvenile court's finding that DCS made diligent efforts to provide reunification services. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 16 (App. 2014). In any event, reasonable evidence supports the court's finding. Initially, Father declined all services, aside from visitation, and he waited several months before indicating he

was willing to participate. At the time of the evidentiary hearing, parent aide services had not been started, although a referral had been made. The delay in services, or the limited offering of services, was largely attributable to Father's decision to initially decline to participate. Thus, we will not overturn the court's rulings based on Father's assertion that DCS failed to make diligent reunification efforts.

## CONCLUSION

**¶16**          We affirm the juvenile court's order terminating Father's parental rights to L.H. and I.H.



AMY M. WOOD • Clerk of the Court
FILED:    AA