NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO J.B. and A.B.

No. 1 CA-JV 23-0160
FILED 3-7-2024

Appeal from the Superior Court in Maricopa County
No. JS519624
The Honorable Amanda S. Chua, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

David W. Bell, Mesa
*Counsel for Appellant Father*

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellee Mother*

Denise L. Carroll, Scottsdale
*Counsel for Appellees J.B. and A.B.*

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Cynthia J. Bailey joined.

**C R U Z**, Judge:

¶1        Christopher B. ("Father") appeals the superior court's order terminating his parental rights to his children J.B. and A.B. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2        In 2018, seven-year-old J.B. and four-year-old A.B. ("the children") were living with their mother ("Mother") and Father in Pennsylvania. Mother served Father with divorce papers on January 29, 2018. That evening, after discussions with Father about their divorce, Mother went to sleep.

¶3        The next day, early in the morning, Mother woke and saw Father walking towards her in the master bedroom with the divorce papers in his hand and a gun in the waistband of his shorts. Mother reached for the gun. Father hit Mother's hand away, grabbed the gun, and pointed it at Mother's head. Mother locked herself in the master bathroom and dialed 9-1-1. While Mother was on the phone with 9-1-1, Father fired three shots into the bathroom door. Father broke down the door, and Mother ran out of the bedroom, down the stairs, and out the front door. As she ran down the stairs, Mother heard J.B. say, "Daddy," and heard Father tell J.B. to go back to his room. Father still had the gun in his hand when he told J.B. to go back to his room. Police arrived shortly after Mother ran from the house and surrounded the house. The children were still inside with Father.

¶4        A SWAT team and hostage negotiator eventually arrived. For several hours, Father refused to respond to police phone calls and loudspeaker instructions. The hostage negotiator was unable to defuse the situation or get the children out of the home. Around 6:30 a.m., police were able to contact the children, who had been asleep, through a surveillance system in J.B.'s bedroom. Police told seven-year-old J.B. to get four-year-old A.B. and exit the front door, and he did so. Father did not help the children leave, and he refused to leave the home. About five hours later, the SWAT team entered the home and took Father into custody. Mother and the children returned to the house that night and observed broken glass everywhere from windows and a door that police had shot out. Lacking funds to stay anywhere else, Mother and the children stayed in the damaged house for several weeks.

¶5            After a jury trial, Father was convicted in Pennsylvania of one count of aggravated assault, a felony, and four misdemeanors—simple assault, reckless endangerment, and two counts of endangering the welfare of children (J.B. and A.B.).  In December 2018, the Pennsylvania trial court sentenced Father to an aggregate term of six to seventeen years in prison.

¶6            In 2019, a Pennsylvania court accepted the parents' custody stipulation and granted Mother physical and legal custody of the children and permission to relocate.  Mother and the children moved to Arizona, and in 2020 Mother petitioned the Maricopa County Superior Court to terminate Father's parental rights to the children and simultaneously asked the court to assume jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act.

¶7            The superior court appointed counsel for Father, and in March 2021, assumed jurisdiction of the case.  On the first day of the termination hearing, Father's court-appointed counsel moved to withdraw, and the court allowed counsel to withdraw and continued the termination adjudication hearing for three days to allow Father's private counsel to file a substitution motion.  Three days later, Father's new counsel appeared and requested a two-week continuance.  The court offered to continue the hearing for three days.  When Father's counsel told the court he was not available then, the superior court dismissed counsel and ordered Father to represent himself.  Trial commenced that day, with Father appearing telephonically from prison.  Minutes into the hearing, Father told the court he would soon be disconnected from the call because the hearing notice stated the hearing would only last one hour, which is what he had told the prison.  After Father left the call, the superior court ordered the trial to proceed by default.  In August 2021, the court terminated Father's parental rights to J.B. and A.B.

¶8            Father appealed, and in September 2022, we vacated the termination order and remanded for further proceedings, finding that the superior court violated Father's due process rights by dismissing his appointed attorney, denying his private attorney a continuance to prepare for trial, and ordering Father to proceed to trial pro se.  *See Christopher B. v. Mia D.,* 1 CA-JV 21-0356, 2022 WL 4376268, at *1-2, ¶¶ 1, 14 (Ariz. App. Sept. 22, 2022) (mem. decision).

¶9            The superior court appointed counsel for Father and the children in December 2022.  After a five-day termination adjudication hearing, the superior court terminated Father's parental rights pursuant to Arizona Revised Statutes ("A.R.S.") sections 8-533(B)(2) (willful abuse),

8-533(B)(4) (length of incarceration for a felony conviction), and 8-533(B)(4) (nature of felony offense/unfit to parent). The court found that termination was in the children's best interests. Father timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), - 2101(A)(1).

**DISCUSSION**

I.      Abuse

**¶10**        The superior court may terminate a parent's parental rights if "the parent has neglected or wilfully abused a child." A.R.S. § 8-533(B)(2). "This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child." *Id.* "Evidence considered by the court pursuant to subsection B of this section shall include any substantiated allegations of abuse or neglect committed in another jurisdiction." A.R.S. § 8-533(C).

> "Abuse" means the infliction or allowing of physical injury, impairment of bodily function or disfigurement or the infliction of or allowing another person to cause serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior and which emotional damage is diagnosed by a medical doctor or psychologist and is caused by the acts or omissions of an individual who has the care, custody and control of a child.

A.R.S. § 8-201(2).

**¶11**        Father "acknowledges that there has been a criminal court finding in the State of Pennsylvania that he endangered his children" and "recognizes that his actions on January 30, 2018 did result in emotional harm to both J.B. and A.B." He "concurs that a legal ground of abuse has been proven," but argues the superior court erred by terminating his parental rights on the abuse ground because the court determined, "contrary to the evidence presented . . . that Father had held the children hostage in the home and suggested the child J.B. witnessed the incident involving Father shooting the weapon."

**¶12**        We view the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the superior court's order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). We will not reverse the superior court's order unless reasonable evidence

does not support the superior court's factual findings. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

**¶13** Even if Father had not waived his objection to termination pursuant to A.R.S. § 8-533(B)(2), we find no error. The superior court found that J.B. "witnessed the events of that day involving his mother fleeing the house after his father fired shots from a gun directed at his mother." Dr. Shannon Fore, the children's therapist from 2019 to the time of the 2023 termination hearing, testified that J.B. told her that after Father shot at Mother, J.B. came out of his room and saw Father with a gun. Dr. Fore opined that this incident, and later "having to run into the arms of armed police officers," was traumatic for J.B. The superior court did not find that J.B. saw Father shooting at Mother, but rather that he had witnessed Mother fleeing the house after Father shot at her. And the record reflects that the children were alone with Father for hours, during which time a hostage negotiator was unable to get the children out of the home with Father's assistance.

**¶14** Additional evidence supported the superior court's determination that Father abused the children. The court considered a 2019 substantiated child abuse investigation concerning Father and J.B. in Pennsylvania, which concluded that Father "intentionally, knowingly and/or recklessly caused" J.B. to suffer serious mental injury. *See* A.R.S. § 8-533(C). The record also contained two additional substantiated child abuse allegations from 2018 concerning Father and each of the children.

**¶15** The court also considered Dr. Fore's testimony that J.B. had disclosed "significant" physical and emotional abuse from Father and had witnessed Father abuse Mother, and Dr. Fore's testimony that the events of January 30, 2018, also traumatized A.B. Dr. Fore additionally testified that A.B. disclosed having witnessed Father screaming at Mother and J.B. and hitting J.B. Dr. Fore opined that both children were still affected by complex trauma. J.B.'s trauma caused him nightmares, night sweats, and significant anger and interpersonal relationship issues, and Dr. Fore opined that he had suffered serious emotional injury. Dr. Fore testified that A.B.'s trauma caused him to have significant anxiety and "nightmares continuously," causing him to refuse to sleep in his room without Mother. Both children regressed behaviorally after writing their letters to the court in lieu of testifying.

**¶16** Dr. Bradley Beckwith was J.B.'s therapist in Pennsylvania for almost a year, beginning in August 2018. Dr. Beckwith testified that J.B. had disclosed emotional abuse by Father and had witnessed Father abuse

Mother and opined that J.B. had been traumatized by the abuse. Dr. Beckwith testified that J.B. exhibited post-traumatic stress symptoms during his therapy sessions. In addition, as talk therapy with Dr. Beckwith progressed, J.B. began experiencing gastrointestinal distress caused by his trauma-related anxiety.

**¶17** The Pennsylvania court appointed Dr. Ronald Esteve to evaluate the children in 2018. Dr. Esteve found that both children had been severely traumatized and diagnosed them with post-traumatic stress disorder. Dr. Esteve opined that the children's trauma was "lifelong," and would "impact them in a multitude of developmental ways as they age."

**¶18** We find no error when we view the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the superior court's termination order. *See Jordan C.*, 223 Ariz. at 93, ¶ 18.

**¶19** Because sufficient evidence supported the superior court's finding that termination was warranted pursuant to A.R.S. § 8-533(B)(2), we need not consider Father's challenges to the alternate grounds of length of incarceration and nature of the felony offense. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

II.     Due Process

**¶20** Father next argues the superior court violated his due process right to a fair trial by making "grossly erroneous factual conclusions, fail[ing] to give proper weight to the plan outlined by the Pennsylvania Family Court, and [giving] improper weight to several expert witnesses who had last met with the children five years ago." According to Father, Dr. Esteve, who was appointed by the Pennsylvania family court in 2019, "failed to follow through on the court's orders related to visitation." Father also seems to argue, even though this was a private termination proceeding, that DCS failed to make reasonable efforts to provide reunification services.

**¶21** Dr. Esteve testified that he was appointed by the Pennsylvania court to assess the children and recommend whether the children should have supervised phone contact with Father during his incarceration. In November 2018, Dr. Esteve submitted a psychological evaluation of the children to the court, recommending they have no contact with Father. A provision in a subsequent Pennsylvania court order allowed Father to submit additional information about his status and participation in mental health services to Dr. Esteve for a reassessment of the no-contact recommendation.

¶22            In 2019, Father submitted a report to Dr. Esteve from a psychiatrist indicating Father had impulse control disorder, explosive tendencies, and a personality disorder. Dr. Esteve testified that he did not change his no-contact recommendation based on Father's additional information. Father cites nothing in the record indicating the Pennsylvania court ordered the children to have contact with Father. Nor does he argue he ever asked the superior court for visitation with the children after it assumed jurisdiction in 2021.

¶23            To the extent Father argues the superior court violated his rights because he was not provided reunification services, we disagree. Father cites *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574 (2021) for this argument. But *Jessie D.* is inapplicable because it does not extend to private petitioners. *See* 251 Ariz. at 582, ¶ 21 (holding that DCS must make reasonable efforts to provide incarcerated parents services upon request, "providing the services will not endanger the child"). And Father cites no authority for the proposition that reunification services must be provided when the ground for termination is abuse, even when DCS is the petitioner (which is not the case here), nor are we aware of any such authority. Nothing in A.R.S. § 8-533(B)(2) requires the superior court to find DCS made diligent efforts to provide reunification services.

¶24            Mother's expert witnesses were Dr. Fore, Dr. Beckwith, and Dr. Esteve. Dr. Fore became the children's therapist when they moved to Arizona in 2019 and was still their therapist at the time of the termination adjudication hearing. Dr. Beckwith was J.B.'s therapist in Pennsylvania for almost a year, beginning in August 2018. Dr. Esteve was appointed by the Pennsylvania court to evaluate the children in 2018. Father cites no authority for his argument that the superior court should not have given weight to Dr. Beckwith's and Dr. Esteve's testimony, and in discussing the witnesses' testimony in its ruling, the court stated, "[t]he Court finds most persuasive, testimony from the children's therapists **in particular the current treating therapist Shannon Fore**, that the children would be re-traumatized should there be further contact with Father." (Emphasis added.) The superior court "is in the best position to weigh evidence and assess witness credibility," and we will not reweigh the evidence. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶¶ 28-30 (2023). And as discussed above, the superior court's factual findings were supported by reasonable evidence.

¶25            We find no violation of Father's due process rights.

III.    Best Interests

¶26     Finally, Father argues the superior court erred by finding that terminating his parental rights was in the children's best interests.  We do not reweigh the evidence and will affirm the superior court's factual findings if supported by reasonable evidence. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 97, ¶ 6 (App. 2016).  "Although fundamental, parental rights are not inviolate; a court may still sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and also finds by a preponderance of the evidence that severance is in the best interests of the child[]." *Id.* at 98, ¶ 7.  Termination is in a child's best interests if the child would "derive an affirmative benefit from termination or incur a detriment by continuing in the relationship." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6 (App. 2004).

¶27     Dr. Fore testified that any contact with Father would "seriously impact [J.B.] negatively" and potentially retraumatize him.  Dr. Fore opined that termination would give both children closure and allow them to heal, "without a never ending . . . cloud over them" about "what's going to happen if they have to see [Father] again."  In their letter to the superior court, both children recounted instances of Father's abuse and expressed not wanting to have a relationship with him.  The superior court found that "maintaining [the] parent-child relationship would be detrimental to the children because Father's actions on 1/30/2018 that lead (sic) to his incarceration ha[ve] broken the bonds that may have existed between Father and the children," and found that the children were still in treatment and needed "the space to move past this traumatic time in their lives and heal, without the presence of Father."  The court considered the totality of the circumstances and found that termination was in the children's best interests.  Reasonable evidence supports that finding.

**CONCLUSION**

¶28     For the foregoing reasons, we affirm the superior court's order terminating Father's parental rights to the children.



AMY M. WOOD • Clerk of the Court
FILED:    AA

8